CITIES OF AUSTIN, DALLAS, FT. WORTH, AND HEREFORD, Petitioners,

v.

SOUTHWESTERN BELL TELEPHONE COMPANY, Respondent.

No. 01–0086.

Supreme Court of Texas.

Argued Feb. 13, 2002.

Decided June 6, 2002.

---

**5.** 39 S.W.3d 280 (Tex.App.-Texarkana 2001, no pet.).

**6.** *Id.* at 285–288.

Ricardo Guzman, James G. Boyle, Law Office of Jim Boyle, Roger B. Borgelt, Assistant Attorney General, Sara Joy Ferris, Office of Public Utility Counsel, Amanda Atkinson, Office of the Attorney General, Austin, for Petitioners.

Robert J. Hearon, Jr., Michael Diehl, Ron H. Moss, Graves Dougherty Hearon & Moody, Jose Varela, Jr., Southwestern Bell Telephone Company, Ann Effinger,

Austin, James D. Ellis, SBC Communications, Inc., San Antonio, for Respondent.

Justice ENOCH delivered the opinion of the Court.

In 1995, the Texas Legislature amended the Public Utility Regulatory Act (PURA) to introduce incentive regulation as an alternative to the traditional rate-of-return scheme for setting telephone rates.[1] Under incentive regulation, a telephone company must cap its rates for basic network services, set according to previously-established rate groups.[2] The rate cap is subject to certain statutory exceptions, including one providing that the Public Utility Commission of Texas (PUC) "shall allow a rate group reclassification that results from access line growth."[3]

Under that exception, Southwestern Bell Telephone Company sought to reclassify several exchanges into higher rate groups. The PUC, instead of reclassifying some of those exchanges, raised the upper boundaries of the respective rate groups, thus leaving the exchanges in the original rate groups and effectively negating much of Southwestern Bell's anticipated revenue growth. The court of appeals held that the PUC was required to reclassify Southwestern Bell's exchanges into higher rate groups if Southwestern Bell established appropriate access line growth, and the PUC could not circumvent that requirement by adjusting rate-group boundaries.[4]

We agree with the court of appeals and affirm its judgment.

## I. THE REGULATORY FRAMEWORK

### A. Rate Setting Before Incentive Regulation

Traditionally, the PUC set telephone company rates for basic network services in ratemaking proceedings using rate-of-return principles.[5] The PUC determined what revenue the telephone company needed to recover a reasonable return on its investment, in addition to its reasonable and necessary expenses.[6] This process involved "rate design" in which the PUC distributed the company's revenue requirements among the various services it offered.[7] The PUC set rates by allocating a company's costs among ratepayer classes.[8]

In a 1976 proceeding using these principles, the PUC adopted a system of rate-group classifications for Southwestern Bell. The PUC divided Southwestern Bell's exchanges into ten rate groups. The PUC classified Southwestern Bell's rate groups according to the number of working telephone lines in each exchange. Rates progressively increased from smaller to larger rate groups, so that customers in exchanges with fewer telephone lines paid less than customers in exchanges with more telephone lines. This pricing structure recognized the value-of-service concept: callers in an exchange with a larger

---

1. *See* Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2045 ·(codified 1997) (current version at TEX. UTIL. CODE ch. 58).

2. TEX. UTIL.CODE §§ 58.021, 58.054. The 1997 version of the Texas Utilities Code applies to this case. Accordingly, all statutory references are to the 1997 version, unless otherwise indicated.

3. TEX. UTIL.CODE § 58.058.

4. 31 S.W.3d 631, 636–38.

5. *See* TEX. UTIL.CODE § 53.051.

6. *See Texas Alarm & Signal Ass'n v. Public Util. Comm'n,* 603 S.W.2d 766, 768 n. 2 (Tex. 1980).

7. *Id.*

8. *See id.*

number of phone lines could reach more telephones without paying long distance charges than callers in a smaller exchange.

Over the years, as a part of its rate-setting process, the PUC periodically adjusted the number and boundaries of Southwestern Bell's rate groups to prevent exchanges with significantly different numbers of telephone lines from being placed in the same rate group. The PUC last made boundary adjustments to Southwestern Bell's rate groups in 1983, assigning Southwestern Bell eight rate groups instead of ten. The PUC also periodically moved Southwestern Bell's exchanges into different rate groups based on access line growth. The PUC last reclassified Southwestern Bell exchanges into different rate groups based on access line growth in 1990.

### B. Incentive Regulation

#### 1. The 1995 pre-codified version

On September 1, 1995, Southwestern Bell elected to participate in the Legislature's newly created incentive regulation. At that time, PURA section 3.352(d) provided that an electing company was "not under any circumstances ... subject to any complaint, hearing, or determination as to the reasonableness of its rates, its overall revenues, its return on invested capital, or its net income."[9] In return, section 3.352(a) required that an electing company commit to making certain infrastructure improvements and to capping its rates for basic network services for a specified time period.[10]

Section 3.353 provided exceptions to section 3.352(a)'s rate cap for: (1) certain changes in Federal Communications Commission (FCC) separations affecting intrastate net income;[11] (2) having less than five million access lines in the state;[12] and (3) rate group reclassification based on access line growth.[13] The exception for rate-group reclassification, contained in section 3.353(c)(4), stated:

> Notwithstanding the commitments made under Section 3.352 of this Act, a rate group reclassification occurring as a result of access lines growth shall be allowed by the commission on request of the electing company.[14]

Section 3.354(c) required the PUC to review any rates adjusted based on access line growth "to ensure that the proposed adjustment conforms to the requirements of Section 3.353(c) of this Act."[15] Section

**9.** Former Tex.Rev.Civ. Stat. art. 1446c–0 § 3.352(d), Act of May 16, 1995, 74th Leg. R.S., ch. 231 § 49, 1995 Tex. Gen. Laws 2017, 2046 (codified 1997) (current version at Tex. Util.Code § 58.025).

**10.** Former Tex.Rev.Civ. Stat. art. 1446c–0 § 3.352(a), Act of May 16, 1995, 74th Leg. R.S., ch. 231 § 49, 1995 Tex. Gen. Laws 2017, 2046 (codified 1997) (current version at Tex. Util.Code § 58.021).

**11.** Former Tex.Rev.Civ. Stat art. 1446c–0 § 3.353(c)(2), Act of May 16, 1995, 74th Leg. R.S., ch. 231 § 49, 1995 Tex. Gen. Laws 2017, 2047 (codified 1997) (current version at Tex. Util.Code § 58.056).

**12.** Former Tex.Rev.Civ. Stat. art. 1446c–0 § 3.353(c)(3), Act of May 16, 1995, 74th Leg.

R.S., ch. 231 § 49, 1995 Tex. Gen. Laws 2017, 2047 (codified 1997) (current version at Tex. Util.Code § 58.057).

**13.** Former Tex.Rev.Civ. Stat. art. 1446c–0 § 3.353(c)(4), Act of May 16, 1995, 74th Leg. R.S., ch. 231 § 49, 1995 Tex. Gen. Laws 2017, 2047 (codified 1997) (current version at Tex. Util.Code § 58.058).

**14.** *Id.*

**15.** Former Tex.Rev.Civ. Stat. art. 1446c–0, § 3.354(c), Act of May 16, 1995, 74th Leg., R.S. ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2048 (codified 1997) (current version at Tex. Util.Code § 58.059).

3.354(e) allowed the PUC, after review, to "issue an order approving, modifying, or rejecting the rate adjustment," depending on whether it was "in compliance with the applicable provisions." [16]

Section 3.353(d)(1) discussed generally "the regulation of basic network services of an electing company." [17] It directed that, "to the extent not inconsistent with this subtitle," such regulation be governed by sections 3.202 and 3.215, among other general rate-making provisions. [18] Section 3.202 required the PUC to ensure that all public utility rates were just and reasonable:

It shall be the duty of the commission to insure that every rate made, demanded, or received by any public utility ... shall be just and reasonable. Rates may not be unreasonably preferential, prejudicial, or discriminatory, but shall be sufficient, equitable, and consistent in application to each class of consumers. [19]

Section 3.215 similarly prohibited a public utility from establishing any unreasonable differences as to service rates between localities:

A public utility may not, as to rates or services, make or grant any unreasonable preference or advantage to any corporation or person within any classification or subject any corporation or person within any classification to any unreasonable prejudice or disadvantage. A public utility may not establish and maintain any unreasonable differences as to rates of service either as between localities or as between classes of service. [20]

## 2. The 1997 codification

In 1997, the Legislature codified the incentive regulation provisions in Texas Utilities Code Chapter 58. [21] The Legislature stated that this codification, which became effective on September 1, 1997, intended no substantive changes from the original language enacted in 1995. [22] The Legislature placed the exception allowing an electing company to seek rate group reclassification based on access line growth in section 58.058. Section 58.058 states:

Notwithstanding Subchapter B, the commission, on request of the electing company, shall allow a rate group reclassification that results from access line growth.

Subchapter B contains section 58.021, which requires an electing company to cap its basic network services rates and make certain infrastructure improvements. It also contains section 58.025, which pro-

---

16. Former TEX.REV.CIV. STAT. art. 1446c–0 § 3.354(e), Act of May 16, 1995, 74th Leg., R.S. ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2048 (codified 1997) (current version at TEX. UTIL.CODE § 58.059).

17. Former TEX.REV.CIV. STAT. art. 1446c–0 § 3.353(d)(1), Act of May 16, 1995, 74th Leg., R.S. ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2047 (codified 1997) (current version at TEX. UTIL.CODE § 58.052).

18. *Id.*

19. Former TEX.REV.CIV. STAT. art. 1446c–0 § 3.202, Act of May 16, 1995, 74th Leg., R.S. ch. 231, § 15, 1995 Tex. Gen. Laws 2017, 2025 (codified 1997) (current version at TEX. UTIL.CODE § 53.003).

20. Former TEX.REV.CIV. STAT. art. 1446c–0 § 3.215, Act of March 29, 1995, 74th Leg., R.S. ch. 9, § 1, 1995 Tex. Gen. Laws 31, 75 (codified 1997) (current version at TEX. UTIL. CODE § 55.005).

21. Former TEX.REV.CIV. STAT. art. 1446c–0, Act of May 8, 1997, 75th Leg., R.S., ch. 166, 1997 Tex. Gen. Laws 713 (current version at TEX. UTIL.CODE ch. 58).

22. Act of May 8, 1997, 75th Leg., R.S., ch. 166 §§ 10, 11, 1997 Tex. Gen. Laws 713, 1018.

vides that an electing company "is not, under any circumstances, subject to any complaint, hearing, or determination regarding the reasonableness of the company's: (1) rates; (2) overall revenues; (3) return on invested capital; or (4) net income."

Under section 58.055, placed in Subchapter C, an electing company "may increase a rate for a basic service network" during the rate cap only with PUC approval that the proposed change is included in section 58.058. Section 58.059 similarly requires PUC authorization for any section 58.058 "rate adjustment." Section 58.059(a) states: the PUC "may authorize a rate adjustment" under section 58.058. Section 58.059(g) similarly provides that the PUC "may issue an order approving the adjustment, or if it finds that the adjustment is not authorized" under section 58.058, it may "issue an order modifying or rejecting the adjustment."

The Legislature also provided in section 58.052(a)(2) that an electing company's basic network services are regulated "to the extent not inconsistent with this chapter," in accordance with sections 53.003 and 55.005, among other general rate-making statutes. Sections 53.003 and 55.005, not contained within the incentive regulation chapter (Chapter 58), prohibit a public utility from subjecting a person to an unreasonable disadvantage in providing services and in charging rates. For example, section 55.005 states, "[i]n providing a service to persons in a classification, a public utility may not: (1) grant an unreasonable preference or advantage to a person in the classification; or (2) subject a person in the classification to an unreasonable prejudice or disadvantage." Section 53.003(c) likewise provides:

A public utility may not: (1) grant an unreasonable preference or advantage concerning rates to a person in a classifi-

cation; (2) subject a person in a classification to an unreasonable prejudice or disadvantage concerning rates; or (3) establish or maintain an unreasonable difference concerning rates between localities or between classes of service.

## II. THIS CASE'S HISTORY

In December 1997, Southwestern Bell requested a rate-group reclassification from the PUC under section 58.058. Predicated primarily on access line growth experienced in three metropolitan areas—Dallas, Fort Worth, and Austin—Southwestern Bell sought to reclassify fifty-two of its 300 Texas exchanges into higher rate groups. Southwestern Bell's request would result in an approximate $30 to $40 million revenue increase. The Cities of Austin, Dallas, Fort Worth, and Hereford (Cities), the Office of Public Utility Counsel (OPUC), and the General Services Commission (GSC) intervened to oppose Southwestern Bell's request. The PUC docketed the proceeding as a contested case and referred it to the State Office of Administrative Hearings for an administrative law judge (ALJ) to hear.

The ALJ concluded that the PUC had authority to limit or modify a rate-group reclassification request under section 58.058. The ALJ relied, in part, on that part of section 58.059(g) providing that the PUC "may issue an order . . . modifying or rejecting the adjustment." The ALJ ruled that section 58.059(g) allowed the PUC to apply precedent and policy as necessary to protect the public interest, which could result in modifying or rejecting a rate-group reclassification request.

The ALJ also looked to section 55.005, which prohibits a public utility from subjecting a person in a classification to an unreasonable prejudice or disadvantage. The ALJ concluded that the PUC's authority to oversee rates and prevent unreason-

able prejudice or disadvantage among customers extended to reclassification under section 58.058. The ALJ opined that an unreasonable disadvantage would occur if Southwestern Bell's Austin and Dallas exchanges were moved to the next higher rate group, because they would not realize the same value for the price as other, larger exchanges in those rate groups. The ALJ accordingly recommended raising the upper boundaries of the rate groups containing those exchanges so that they would not fall into higher rate groups. The PUC adopted all of the ALJ's proposed findings of fact and conclusions of law. The PUC's order concludes, "[t]o put Austin in the same rate group as exchanges with considerably more [access lines] would be a departure from the rate-design strategies used by the [PUC] in the past" which "amended the lower and upper limits of rate groups in order to achieve equitable rates for all customers." The PUC also made additional rulings not at issue here.

Southwestern Bell sought judicial review of the PUC's order in the district court. The district court concluded that the PUC had the authority, as a process of rate design, to adjust rate group boundaries in a proceeding under section 58.058. The district court accordingly affirmed the PUC's order on that issue.

Southwestern Bell appealed several issues to the court of appeals. The court of appeals affirmed in part and reversed in part the district court's judgment.[23] Pertinent here, the court of appeals held that section 58.058 required the PUC to reclassify exchanges into new rate groups when an electing company proved access line growth.[24] The court noted that, in contrast to the PUC's prior practice, section 58.025 provides that an electing company is not "under any circumstances," subject to complaint, hearing, or determination regarding the reasonableness of its rates.[25] The court concluded that, by changing rate group boundaries, the PUC was conducting a "reasonableness" inquiry that section 58.025 prohibits.[26]

The PUC, Cities, OPUC, and GSC filed petitions for review with this Court. We granted the petitions to consider whether the Legislature gave the PUC power to adjust rate-group boundaries as part of a section 58.058 rate-group reclassification request.

## III. THE PUC'S GENERAL POWERS

 As a state administrative agency, the PUC has those powers that the Legislature expressly confers upon it.[27] The PUC may also have implied powers necessary to accomplish the express duties that the Legislature gives to it.[28] But the PUC may not exercise what is effectively a new power, or a power contrary to a statute, on the theory that such a power is expedient for administrative purposes.[29] Further, we give weight to how the PUC interprets

23. 31 S.W.3d at 642.

24. *Id.* at 638.

25. *Id.*

26. *Id.*

27. *Public Util. Comm'n v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 315 (Tex.

2001); *Public Util. Comm'n v. GTE–Southwest, Inc.,* 901 S.W.2d 401, 407 (Tex.1995); *State v. Jackson,* 376 S.W.2d 341, 344 (Tex. 1964).

28. *Public Util. Comm'n,* 53 S.W.3d at 315.

29. *Id.* at 316; *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 137–38 (Tex.App.-Austin 1986, writ ref'd n.r.e.).

its own powers, but only if that interpretation is reasonable and not inconsistent with the statute.[30]

To determine what powers the Legislature conferred on the PUC in evaluating section 58.058 rate-group reclassification requests, we first look to the pertinent statutes.[31] We begin with the words used.[32] We may also consider the object to be attained by the statutes, the circumstances surrounding the statutes' enactment, legislative history, former statutory and common law, and the consequences of a particular construction.[33]

■■■■ In this context, several principles guide us. Generally, we will accept the words used according to their ordinary meaning, unless given a specific statutory definition;[34] we will not give them an exaggerated, forced, or constrained meaning.[35] Also, we will presume that the Legislature used every word of a statute for a purpose.[36] Finally, we will try to avoid construing a statutory provision in isolation from the rest of the statute; we should consider the act as a whole, and not just single phrases, clauses, or sentences.[37]

## IV. THE PUC HAS NO POWER TO ADJUST RATE GROUP BOUNDARIES UNDER SECTION 58.058

■■■ Petitioners rely on section 58.058's introductory phrase—"[n]otwithstanding Subchapter B," PUC precedent and policy, and numerous other statutes to argue that the Legislature has authorized the PUC to adjust rate-group boundaries in a section 58.058 rate-group reclassification request. We disagree. We hold that, by adjusting rate-group boundaries in this case, the PUC exceeded its statutory powers.[38]

Section 58.058 states:

Notwithstanding Subchapter B . . . the commission, on request of the electing company, shall allow a rate group reclassification that results from access line growth.

Section 58.058 uses the word "shall," which we generally construe as mandatory, unless legislative intent suggests otherwise.[39] Nothing in section 58.058's language permits the PUC to adjust rate group boundaries to prevent the very reclassification that section allows. We agree with the court of appeals that to allow the PUC to avoid section 58.058's mandate in this way "would undermine the legislative intent expressed in the statute's plain language."[40]

---

**30.** *Public Util. Comm'n,* 53 S.W.3d at 316; *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993).

**31.** *See Citizens Bank v. First State Bank,* 580 S.W.2d 344, 348 (Tex.1979); *Minton v. Frank,* 545 S.W.2d 442, 445 (Tex.1976).

**32.** *See* Tex. Gov't Code § 311.011; *Kroger Co. v. Keng,* 23 S.W.3d 347, 349 (Tex.2000); *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865 (Tex.1999).

**33.** Tex. Gov't Code § 311.023; *Osterberg v. Peca,* 12 S.W.3d 31, 38 (Tex.2000).

**34.** *See Osterberg,* 12 S.W.3d at 38.

**35.** *Commissioners Court of Caldwell County v. Criminal Dist. Attorney,* 690 S.W.2d 932, 936 (Tex.App.-Austin 1985, writ ref'd n.r.e.).

**36.** *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981); *Barr v. Bernhard,* 562 S.W.2d 844, 849 (Tex.1978).

**37.** *Morrison v. Chan,* 699 S.W.2d 205, 208 (Tex.1985); *Cameron,* 618 S.W.2d at 540; *Barr,* 562 S.W.2d at 849.

**38.** *See Public Util. Comm'n,* 53 S.W.3d at 315.

**39.** *See* Tex. Gov't Code § 311.016(2); *Albertson's, Inc. v. Sinclair,* 984 S.W.2d 958, 961 (Tex.1999); *Schepps v. Presbyterian Hosp. of Dallas,* 652 S.W.2d 934, 936 (Tex.1983).

**40.** 31 S.W.3d at 637.

Another section, section 58.025, supports our conclusion. Section 58.025 states that an electing company is not, "under any circumstances," subject to a determination regarding the reasonableness of its rates. Thus, the PUC could not inquire into the reasonableness of Southwestern Bell's rates in evaluating the reclassification request. But, the PUC did precisely that when it adjusted Southwestern Bell's rate-group boundaries. As the PUC's order states, "[t]o put Austin in the same rate group as exchanges with considerably more [access lines] would be a departure from the rate-design strategies used by the [PUC] in the past" which "amended the lower and upper limits of rate groups in order to achieve equitable rates for all customers." Though specifically prohibited from doing so, the PUC adjusted Southwestern Bell's rate-group boundaries to "achieve equitable rates." As the court of appeals correctly recognized, the PUC's actions:

> necessarily involved an inquiry into the reasonableness of [Southwestern Bell's] rates or revenues—i.e., the [PUC] refused to move Austin and Dallas into higher rate groups because it determined that it would be *unreasonable* to charge the same tariff to customers in cities with significantly different numbers of access lines. Section 58.025 expressly prohibits such a determination of the reasonableness of rates or revenues.[41]

In the court of appeals, petitioners pointed to sections 58.055 and 58.059, arguing that they permit the PUC's participation in rate-group reclassifications. Section 58.055(a) provides that an electing company "may increase a rate for a basic network service" with PUC approval that the proposed change is included in section 58.058. Section 58.059(a) states that the PUC "may authorize a rate adjustment" under section 58.058. Section 58.059(g) further provides that the PUC "may issue an order approving the adjustment, or if it finds that the adjustment is not authorized" under section 58.058, it "may issue an order modifying or rejecting the adjustment."

Sections 58.055 and 58.059 do not give the PUC discretion to adjust rate-group boundaries to avoid the reclassification authorized by section 58.058. Rather, those sections give the PUC discretion to reject or modify a reclassification request if, for example, the electing company has not proven access line growth or has improperly calculated such growth.[42]

## A. The Effect of "Notwithstanding Subchapter B"

■ Petitioners argue that the PUC has the power to conduct at least a limited inquiry into the reasonableness of an electing company's rates under section 58.058, because the Legislature used the phrase "[n]othwithstanding Subchapter B." Petitioners note that Subchapter B contains section 58.021, which requires an electing company to cap its rates. And, they point out, Subchapter B also contains section 58.025, which is the section that would otherwise prohibit any determination about the reasonableness of an electing company's rates. Therefore, petitioners argue, the Legislature excepted both the rate cap and the provision limiting the PUC's authority to review a rate's reasonableness from section 58.058.

Petitioners' argument fails, however. First, petitioners agree that the 1997 codification did not change the 1995 statute.

---

41. *Id.*

42. *See Cameron,* 618 S.W.2d at 540; *Barr,* 562 S.W.2d at 849.

And, when the Legislature codified the incentive regulation provisions, it expressly stated that the codification made no substantive changes to the earlier statute.[43] So the codification is the same as its predecessor. Accordingly, we read section 58.058's introductory phrase "[n]otwithstanding Subchapter B" to be the same as the phrase "[n]otwithstanding the commitments made under Section 3.352," contained in section 3.353(c)(4)[44]—section 58.058's statutory predecessor.[45]

To determine what "commitments" section 3.353(c)(4) referenced, we look to section 3.352. Section 3.352 mentioned only two "commitments"—the electing company's "commitment" to cap its rates for a specified time period and the electing company's "commitment" to make certain infrastructure improvements.[46] Section 3.352 also contained the provision prohibiting inquiry "under any circumstances" into the reasonableness of an electing company's rates.[47] But that prohibition did not mention any "commitment," either by the electing company or the PUC. It thus appears that section 3.353(c)(4)'s introductory phrase was referring solely to the electing company's commitments to cap its rates and make certain infrastructure improvements.

In any event, while section 58.058 uses the phrase "[n]otwithstanding Subchapter B," instead of "[n]otwithstanding the commitments," we do not consider this difference in language to be irreconcilable.[48] Given the Legislature's statement that the codification made no substantive changes from the earlier statute, and the obvious similarity between the pertinent 1995 and 1997 provisions, we conclude that the Legislature intended the two phrases to mean the same thing.[49]

Accordingly, we construe the phrase "[n]otwithstanding Subchapter B" as referring only to an electing company's commitments to cap its rates and make certain infrastructure improvements. It does not refer to the prohibition against inquiries into the reasonableness of an electing company's rates. Therefore, the phrase "[n]otwithstanding Subchapter B" does not except reasonableness inquiries from section 58.058 proceedings. It likewise does not empower the PUC to adjust rate-group boundaries to ensure equitable rates.

### B. The Meaning of "Rate Group Reclassification"

■ Petitioners argue that "rate group reclassification" has acquired "a technical or particular meaning" and must be construed accordingly.[50] Petitioners insist that "rate group reclassification" means

**43.** Act of May 8, 1997, 75th Leg., R.S., ch. 166 § 10, 1997 Tex. Gen. Laws 713, 1018 (S.B.1751).

**44.** Former Tex.Rev.Civ. Stat art. 1446c–0 § 3.353(c)(4), Act of May 16, 1995, 74th Leg., R.S., ch. 231 § 49, 1995 Tex. Gen. Laws 2017, 2047 (codified 1997) (current version at Tex. Util.Code § 58.058).

**45.** See Tex. Gov't Code § 311.023; *Osterberg,* 12 S.W.3d at 38.

**46.** Former Tex.Rev.Civ. Stat. art. 1446c–0 § 3.352(a), Act of May 16, 1995, 74th Leg., R.S., ch. 231 § 49, 1995 Tex. Gen. Laws 2017, 2046 (codified 1997) (current version at Tex. Util.Code § 58.021).

**47.** Former Tex.Rev.Civ. Stat. art. 1446c–0 § 3.352(d), Act of May 16, 1995, 74th Leg., R.S., ch. 231 § 49, 1995 Tex. Gen. Laws 2017, 2046 (codified 1997) (current version at Tex. Util.Code § 58.025).

**48.** See, e.g., *Fleming Foods of Texas, Inc. v. Rylander,* 6 S.W.3d 278, 286 (Tex.1999).

**49.** See, e.g., id.

**50.** Tex. Gov't Code § 311.011(b).

more than merely a process involving an increase in rates. Rather, petitioners assert it has been understood as a deliberative rate-design process aimed at balancing rates across populations by, among other things, adjusting rate-group boundaries. Therefore, petitioners contend that "rate group reclassification" in section 58.058 includes adjusting rate-group boundaries.

■■■ As we noted, the PUC historically adjusted rate-group boundaries to achieve equitable rates for all customers. But, interpreting "rate group reclassification" in section 58.058 as allowing the PUC to adjust rate-group boundaries to "achieve equitable rates" directly contradicts section 58.025's prohibition against determining the reasonableness of an electing company's rates. We agree with the court of appeals that:

> Under rate-of-return regulation, rate-group reclassification was used as a rate-design tool to keep access-line growth essentially revenue neutral. The mandatory language of section 58.058—combined with section 58.025's promise that [Southwestern Bell] 'is not, under any circumstances, subject to a complaint, hearing, or determination regarding the reasonableness' of its rates or revenues—convinces us that rate-group reclassification cannot continue to be so used for utilities that opt for incentive regulation.[51]

### C. Legislative Acceptance Under Section 58.055

■■■ We disagree with petitioners that the doctrine of legislative acceptance requires us to defer to the PUC's interpretation of section 58.055 as allowing it to adjust rate-group boundaries in a section 58.058 proceeding. Under that doctrine, when the Legislature reenacts a statute of doubtful meaning with a long-standing administrative construction without substantially changing the language, the court construes the statute as the agency did.[52] In 1999, the Legislature amended section 58.055 without changing the language requiring PUC approval that an electing company's proposed rate adjustment is included in section 58.058.[53] Thus, petitioners contend the Legislature accepted the PUC's interpretation of section 58.055, because the PUC's order reaching that conclusion had existed for about a year when the Legislature amended section 58.055.[54]

Petitioners' argument ignores the fact that we are currently reviewing that PUC order which, for the first time, interpreted section 58.055 as authorizing rate-group boundary adjustments in section 58.058 proceedings.[55] Therefore, the PUC's interpretation can hardly be deemed "a long-standing administrative construction." Moreover, section 58.055 is not "a statute of doubtful meaning." As we explained, by its own language, section 58.055 permits the PUC to approve a rate reclassification, but only to ensure the reclassification is consistent with that permitted under section 58.058. Its language in no way authorizes the PUC to adjust rate-group boundaries as part of that process.

**51.** 31 S.W.3d at 638.

**52.** *Humble Oil & Refining Co. v. Calvert*, 414 S.W.2d 172, 180 (Tex.1967).

**53.** *See* Tex. Util.Code § 58.055 (Supp.2002).

**54.** *See id.*

**55.** Tex. Pub. Util. Comm'n, *Application of Southwestern Bell Telephone Company for Rate Group Reclassification Pursuant to Section 58.058 of the Texas Utility Code*, Docket No. 18509, 1999 Tex. PUC LEXIS 24 (Jan. 26, 1999) (order on Southwestern Bell's application to reclassify certain exchanges).

### D. Sections 53.003 and 55.005 Do Not Authorize The PUC's Rate–Group Boundary Adjustments

Petitioners contend that if we interpret sections 58.025 and 58.058 as precluding the PUC from adjusting rate-group boundaries, the PUC will be unable to enforce sections 53.003 and 55.005. Sections 53.003 and 55.005, which are not contained within the incentive regulation provisions, prohibit a public utility from engaging in discriminatory pricing. Petitioners assert that, by adjusting rate-group boundaries, the PUC enforced sections 53.003 and 55.005 by preventing Southwestern Bell's smaller exchanges from paying the same rate as its larger exchanges.

Petitioners' argument does not withstand scrutiny, however, under section 58.052. The Legislature specifically provided in section 58.052(a)(2) that an electing company's basic network services are regulated according to sections 53.003 and 55.005 "to the extent not inconsistent with [Chapter 58]." Thus, the Legislature was aware that sections 53.003 and 55.005 might not be given effect in certain proceedings brought under Chapter 58. To the extent sections 53.003 and 55.005 authorize the PUC to examine the reasonableness of an electing company's rates, those sections directly contradict section 58.025's prohibition against such inquiries "under any circumstances." And, section 58.055 unambiguously states that section 58.025 prevails over sections 53.003 and 55.005 where such a contradiction exists.

### V. CONCLUSION

We conclude that Chapter 58 does not, either expressly or impliedly, authorize the PUC to circumvent its mandatory duty to allow an otherwise appropriate section 58.058 rate-group reclassification by adjusting rate-group boundaries. This conclusion gives effect to all provisions in Chapter 58 and the Legislature's intent "to free an electing utility from traditional ratemaking." [56] Because the PUC adjusted certain rate-group boundaries in evaluating Southwestern Bell's rate-group reclassification request, the PUC exceeded its statutory powers.[57]

We accordingly affirm the court of appeals' judgment, and remand this matter to the trial court to remand to the PUC for further proceedings consistent with this opinion.

Justice HANKINSON did not participate in the decision.

**56.** 31 S.W.3d at 637.

**57.** *See Public Util. Comm'n,* 53 S.W.3d at 315; *Sexton,* 720 S.W.2d at 137–38.