# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-03-00428-CV

Cities of Corpus Christi, et al.,[1] Appellants//AEP Texas Central Company; Public Utility Commission of Texas; and Constellation New Energy, Inc., Cross-Appellants

v.

Public Utility Commission of Texas and AEP Texas Central Company, Appellees//Public Utility Commission of Texas; Cities of Corpus Christi, et al.;Office of Public Utility Counsel; and Constellation New Energy, Inc., Cross-Appellees

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
NO. GN104182, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## DISSENTING OPINION

While I join the majority in affirming the Commission's handling of the member account balances with Nuclear Electric Insurance Limited and the demand charge issues, I strongly disagree that prior to 2004 the Commission lacked the authority to require AEP Texas Central

---

[1] The cities participating in this appeal are municipalities served by AEP Texas Central Company, the transmission and distribution utility formerly owned by Central Power and Light Company, and include Alice, Aransas Pass, Beeville, Camp Wood, Carrizo Springs, Charlotte, Corpus Christi, Cotulla, Dilley, Eagle Pass, Edinburg, Edna, Ganado, George West, Gregory, Harlingen, Ingleside, Karnes City, Kingsville, La Feria, Laredo, Leakey, Los Fresnos, Lyford, Lytle, Mathis, McAllen, Mercedes, Odem, Orange Grove, Pearsall, Pleasanton, Port Aransas, Port Isabel, Port Lavaca, Rancho Viejo, Raymondville, Refugio, Rio Hondo, Rockport, Roma, San Benito, San Juan, Sinton, Smiley, Taft, and Victoria. The City of Corpus Christi has served as the "lead" city in this litigation. We will refer to these municipalities collectively as "the Cities."

Company to refund the excess earnings it had retained to accelerate the recovery of stranded costs when changed market circumstances eliminated the prospect of any stranded costs. I would hold that the Commission's action is entitled to deference because (1) it was a reasonable method of meeting its statutory obligations of encouraging "full and fair competition among all providers of electricity" and preventing the overrecovery of stranded costs, *see* Tex. Util. Code Ann. §§ 39.001(b)(1), .262(a) (West Supp. 2004-05); and (2) it did not conflict with any express provision, or the overall intent, of PURA Chapter 39. *See City of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 441-42 (Tex. 2002) (we give weight to Commission's interpretation of its own powers if it is reasonable and not inconsistent with statute); *Southwestern Bell Telephone Co. v. Public Util. Comm'n*, 863 S.W.2d 754, 758 (Tex. App.—Austin 1993, writ denied) (we defer to agency's construction of statute that agency is charged with enforcing). Accordingly, I respectfully dissent.

Because I would hold that the Commission had the authority to order the refunds, I must briefly address AEP's complaints that (1) the Commission erred by not providing for interest on any excess mitigation revenues refunded now that may be awarded to AEP as stranded costs in the 2004 true-up proceeding, and (2) the district court erred in ordering AEP to pay excess mitigation refunds to consumers rather than to REPs, as the Commission had ordered. Since the reasons expressed in the Commission's order represent a reasonable construction of the relevant provisions of PURA Chapter 39, I would affirm its determination that (1) AEP is not entitled to interest on any refunded revenues that may be awarded as stranded costs in 2004 and (2) that AEP should refund its excess mitigation to REPs, rather than directly to consumers.

**DISCUSSION**

AEP challenges the Commission's authority to order a refund of excessive stranded costs collected through mitigation tools provided by statute. We are by now familiar with the fact that, before deregulation, utilities invested in generation assets expecting to recover their reasonable and prudent costs through regulated rates. Recognizing that the costs of these assets might become uneconomical and thus unrecoverable in a competitive, deregulated electric power market, the legislature devised a three-phase program to enable formerly regulated utilities to recover their investments during the transition from regulation to deregulation. *See Centerpoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81, 82-83 (Tex. 2004); *Reliant Energy, Inc. v. Public Util. Comm'n*, 101 S.W.3d 129, 133-34 (Tex. App.—Austin 2003), *rev'd in part sub nom Centerpoint Energy*, 143 S.W.3d at 99. The phrase "stranded costs" represents that portion of the net book value of a utility's generation assets, not yet recovered through depreciation, that has become unrecoverable in a deregulated environment. *See* Tex. Util. Code Ann. § 39.251(7) (West Supp. 2004-05); *Centerpoint Energy*, 143 S.W.3d at 82-83; *Reliant Energy*, 101 S.W.3d 129 at 133.[2]

As the legislature was devising the three-phase stranded cost recovery scheme, it considered the April 1998 Report to the Texas Senate Interim Committee on Electric Utility Restructuring that (1) identified nine incumbent utilities as having probable stranded costs as of December 31, 2001, the last day of regulation; and (2) projected extremely high stranded costs for the nuclear power generation held by those utilities. This report was derived using the Excess Cost Over Market (ECOM) Model, a complex computer modeling program that takes into account a

---

[2] A stranded cost is the positive excess of the net book value of generation assets over the market value of the assets. Tex. Util. Code Ann. § 39.251(7) (West Supp. 2004-05).

3

variety of factors that would impact the market value of generating assets. Based on the 1998 Report, the legislature determined that stranded cost recovery should begin immediately to ensure a proper return to utilities and to avoid a massive recovery in one year that might have an injurious effect on the competitive market that the legislature was hoping to foster by deregulating the electric industry. *Centerpoint*, 143 S.W.3d at 83; *Reliant*, 101 S.W.3d at 134; *In re TXU Elec. Co.*, 67 S.W.3d 130, 149 (Tex. 2001) (Brister, J., concurring). An important part of the deregulation scheme was to accelerate the recovery of stranded costs beginning in 1999 to avoid excessive recoveries when the competitive market began in 2002 or when the costs were to be finally reconciled in 2004.

In Phase I, covering years 1998 through 2001, the legislature required the utilities identified in the 1998 Report to begin mitigating their stranded costs through measures designed to reduce the book value of their generation assets. *Reliant*, 101 S.W.3d at 134. To do this, the utilities could (1) transfer depreciation from transmission and distribution assets to generation assets, (2) retain earnings generated under frozen rates, and (3) securitize a portion of their estimated stranded costs by selling transition bonds and using the proceeds to reduce the book value of their generation assets. *See* Tex. Util. Code Ann. §§ 39.256, .301-313; *Reliant*, 101 S.W.3d at 134. These measures were referred to as mitigation tools, and it was intended that they would accelerate the recovery of the enormous stranded costs that were projected by the 1998 ECOM model to occur under competitive rates beginning in 2002. Stranded costs were to be calculated on the book value of generation assets as of the last day of regulation, December 31, 2001; the excess of this book value over market value would be treated as a stranded cost. *Centerpoint*, 143 S.W.3d at 87.

4

Both the competitive market and Phase II of the stranded cost recovery scheme began on January 1, 2002. Although a utility's stranded costs were to be determined as of the day before competition began, the legislature recognized that a meaningful valuation of a utility's assets could not be made until the deregulated market endured a period of fluctuation and the rates were allowed to stabilize. *Id*. The legislature wisely determined that it might take up to two years for this market to stabilize and that following the early mitigation efforts and the beginning of competitive rates, there would be a two-year lag time before a utility's over- or underrecovery of stranded costs could be reconciled by the Commission. Tex. Util. Code Ann. § 39.201(l).

During Phase II, the Commission was authorized to set a "competition transition charge" (CTC), which would be added to the transmission and distribution rates for 2002 and 2003 to allow utilities to recover any stranded costs remaining after the mitigation efforts of Phase I. *See generally id*. § 39.201; *Reliant*, 101 S.W.3d at 135. In 2001, each utility was ordered to estimate, using the ECOM administrative model with updated data, its stranded costs based on the book value of its generation assets on the last day of regulation. Tex. Util. Code Ann. § 39.201(h). In determining whether to set a CTC, the Commission was required to consider the newly revised stranded cost estimates based on the 2001 ECOM model. *Id*.; *Reliant*, 101 S.W.3d at 135.

In a reversal of expectations, the rise of the cost of natural gas made nuclear power plants more desirable and hence more valuable in 2001. Instead of having additional stranded costs under the 2001 ECOM model estimates, AEP was shown to have negative stranded costs; that is, the market value of its nuclear assets greatly exceeded their book value. Given this revised projection, AEP had $54 million in excess retained earnings; by using mitigation tools, it had

5

overrecovered its estimated stranded costs. It is clear from PURA Chapter 39 that the legislature contemplated that even after extensive mitigation efforts, a utility might have remaining stranded costs, and it provided a remedy by authorizing the Commission to impose a CTC during 2002 and 2003. Tex. Util. Code Ann. § 39.201(d). The legislature never contemplated that the estimated stranded costs might diminish rather than increase in value; it provided no express remedy for this circumstance. Considering its statutory obligation to foster competition while preventing the overrecovery of stranded costs, the Commission imposed no CTC and additionally ordered AEP to refund the $54 million in retained earnings as an excess mitigation credit to retail electric providers (REPs), amortized over five years. *Id*. § 39.262(a).

AEP brought suit for judicial review, insisting that the Commission had no authority to order a refund of excess mitigation credits before 2004. The district court disagreed and held that the Commission had the implied power to take action to reverse the overrecovery of stranded costs at the beginning of Phase II, based on the 2001 estimates. The majority contends that the electric deregulation scheme is so well-thought out and comprehensive that it leaves no room for Commission discretion. Consequently, it argues that the lack of an explicit grant of statutory authority establishes that the legislature did not intend for the Commission to take any action to address the overrecovery of stranded costs prior to 2004. To the contrary, the legislature authorized the Commission to adjust the recovery of stranded costs in the first year of the deregulated market because underrecovered costs would have an impact on the new competitive market. However, the legislature assumed the only adjustment needed after mitigation efforts would be the imposition of a CTC to recover remaining stranded costs. It simply failed to address the possibility of a utility's

6

overrecovery, creating an ambiguity, and yet the overrecovery of stranded costs would also have a negative impact on fair and full competition. Consequently, the Commission took action to reduce the overrecovered costs by ordering AEP to issue excess mitigation credits to its REPs over a five-year period. I would affirm the Commission's action in ordering the refund when it did because (1) Chapter 39 called for the Commission to adjust the recovery of stranded costs at the beginning of the deregulated market in 2002 by consulting the 2001 ECOM model; (2) the legislature did not provide a specific remedy for the reversal in market conditions that occurred in this case; (3) the Commission's order to refund excess mitigation credits is a reasonable interpretation of an ambiguous statute, does not conflict with any specific statutory provision, and promotes the underlying purposes of Chapter 39; and (4) the Commission is obligated to prevent the overrecovery of stranded costs while promoting full and fair competition among all electric providers. Therefore, I conclude that the Commission's order is entitled to deference.

**Ambiguous scheme**

I begin by rejecting the majority's notion that the statutory scheme for the transition to a deregulated market is so comprehensive that it affords no discretion to the Commission to correct an overrecovery while it adjusts the recovery of stranded costs in 2002. The statutory scheme is thoughtful and careful, but the transition to deregulation is a complex undertaking and it was impossible for the legislature to anticipate every consequence that might arise. Although it was mindful of the possibility of enormous capital investments that might exceed the market value of generation assets and fail to be recovered by competitive rates, the legislature neglected to consider the very circumstance that occurred: the rise in the market value of nuclear generation assets in 2001

that eliminated the need to mitigate the massive stranded costs that had been projected in 1998. This made the legislative scheme ambiguous as to the proper action the Commission should take when it was directed to adjust the ECOM projections using 2001 data and impose a CTC if stranded costs remained. The Commission was called upon to exercise its expertise and discretion to determine what to do when faced with an enormous overrecovery, rather than an underrecovery of stranded costs. In doing so, the Commission determined that its combined duties of implementing deregulation in a manner that "encourages full and fair competition among all providers of electricity," and preventing individual utilities from overrecovering stranded costs, compelled it at the beginning of the competitive market to order AEP[3] to grant excess mitigation credits representing overrecovered stranded costs during Phase II, in addition to not imposing a CTC. *See id*. §§ 39.001(b)(1), .262(a).

We have long recognized that because the legislature cannot contend with every imaginable detail involved in carrying out applicable laws, delegation of some legislative power to regulatory agencies is both necessary and proper. *Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 654 (Tex. 2004). Thus, the legislature may delegate its powers to administrative agencies established to carry out legislative purposes as long as it establishes reasonable standards to guide the agencies in exercising those powers. *Id*. If the legislature were required to include every detail and anticipate all unforeseen circumstances then there would be no need for delegation. *See Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex. 1992).

---

[3] We note that AEP is the only utility of those identified in 2001 to have overrecovered stranded costs that has challenged on appeal the Commission's authority to order a refund of excess mitigation credits prior to the 2004 true-up proceeding.

The Commission has those powers that the legislature expressly confers upon it. *City of Austin*, 92 S.W.3d at 441. In addition, the Commission has any implied power necessary to accomplish the express duties that the legislature gives to it.[4] *Id.* We give serious consideration to the Commission's interpretation of PURA, as long as that interpretation is reasonable and does not contradict the plain language of the statute. *Id.* at 441-42; *Continental Cas. Co. v. Downs*, 81 S.W.3d 803, 807 (Tex. 2002). Furthermore, we give due deference to an agency's construction of a statute that the agency is charged with enforcing. *See Southwestern Bell Tel.*, 863 S.W.2d at 758. In order to ascertain whether the Commission possessed the authority to order AEP to refund overrecovered stranded costs before the 2004 true-up proceedings, we must analyze Chapter 39 as a whole, in the context of the transition to a deregulated electric market. *See State v. Public Util. Comm'n*, 883 S.W.2d 190, 196 (Tex. 1994) (court must read PURA as a whole to discover underlying legislative intent).

### Chapter 39

When construing Chapter 39 as a whole, it was reasonable for the Commission to determine that the legislature intended for it to address a utility's over-mitigation of stranded costs before the 2004 true-up proceedings. *See id.* For example, the Commission is required to consider updated stranded cost projections in order to impose or modify a utility's CTC as deregulation begins. Tex. Util. Code Ann. § 39.201(g). Additionally, when determining the length of time a

---

[4] Specifically, the legislature granted the Commission the authority to do anything "necessary and convenient" to exercise any power that is explicitly provided or implied by PURA. Tex. Util. Code Ann. § 14.001 (West 1998).

utility may recover stranded costs through a CTC, the Commission must consider both the proportion of estimated stranded costs to the invested capital of the utility and any other factor consistent with public interest as expressed in Chapter 39. *Id.* § 39.201(k). One reasonable consideration should be the Commission's express duty to prevent the overrecovery of stranded costs. *See id.* § 39.262(a). If no stranded costs remain after the Commission reviews a utility's mitigation efforts, it will not impose a CTC. But to permit the utility to retain earnings of $54 million would skew the deregulated market by giving that utility an unfair advantage over other competitors and discourage full competition. Thus, the Commission should have the authority to address the overrecovery of stranded costs by a utility at the same time it would have addressed any underrecovery by setting a CTC.

Additional evidence that the legislature intended for the Commission to take action prior to the true-up proceedings can be found in the structure of the three-phase stranded cost recovery scheme. The fact that a utility was required to immediately begin mitigating its stranded costs during Phase I illustrates the legislature's desire that the formerly regulated utilities not have the burden of waiting until 2004 to recover their costs. Conversely, if the 2001 ECOM model shows that the utility has overrecovered stranded costs then it makes sense that the utility should not have the privilege of waiting until 2004 to disgorge those excess mitigation costs. Furthermore, it is logical to assume that the legislature would establish a scheme that is symmetrical. Therefore, if the Commission has the authority to address the underrecovery of stranded costs during Phase II by setting a CTC, it must have the authority to adjust the recovery of stranded costs that the utility is not entitled to at the time that competition begins. In fact, the manner in which the Commission

10

ordered AEP to refund its overrecovered stranded costs parallels the overall treatment of stranded costs. Under the statutory scheme AEP was allowed to mitigate its stranded costs immediately throughout Phase I (1999-2001). If the 2001 projections had shown that despite AEP's mitigation efforts stranded costs remained, the Commission would have set a CTC immediately in 2002 to continue AEP's recovery during the first two years of competition. Likewise, when the 2001 projections indicated that AEP's mitigation efforts had been too successful, the Commission ordered AEP to grant excess mitigation credits amortized over five years. The fact that the Commission amortized the refund signifies its recognition that the legislature did not intend for the recovery of stranded costs to occur in a lump sum at one time, such as the true-up proceeding in 2004. This would have an adverse effect on a competitive market. It devised a scheme spreading recovery over several years; mitigation would occur early (1999-2001), and would be adjusted in 2002 and 2003, prior to a final reconciliation two years after the competitive market had stabilized in 2004. The true-up proceeding was to be a *final* adjustment, not the *only* adjustment.

Finally, the Commission's decision to order refunds of overrecovered stranded costs is consistent with Chapter 39's goal of promoting competitive markets after deregulation. If a utility was allowed to retain its excess earnings from Phase I when competition begins it would have an unfair advantage over newly created utilities throughout Phase II. Preventing the overrecovery of stranded costs is a tool necessary to promote competition by creating a level playing field.

In conclusion, the Commission's decision to order AEP to refund its overrecovered stranded costs prior to the beginning of competition was reasonable and consistent with its dual goals of preventing a utility from overrecovering stranded costs and promoting competition.

11

***Section 39.262(a)***

The majority correctly asserts that we must construe the relevant provisions of Chapter 39 in order to determine the scope of the Commission's powers. Although the majority cites to many of the rules of statutory construction, it ignores two principles that are relevant to this issue. First, when statutory text is unambiguous, a court must adopt the interpretation supported by the statute's plain language unless that interpretation would lead to absurd results. *See Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 177 (Tex. 2004). Second, the heading of a title, subtitle, chapter, subchapter, or section does not limit or expand the meaning of a statute. *See* Tex. Gov't Code Ann. § 311.024 (West 2005). I contend that the application of these two principles demonstrates that the majority has misconstrued the scope of section 39.262(a).

Section 39.262(a) states that, "[a]n electric utility . . . may not be permitted to overrecover stranded costs through the procedures established by this section or through the application of the measures provided by the other sections of this chapter." Tex. Util. Code Ann. § 39.262(a). The text does not say when the Commission is to act to prevent the overrecovery of stranded costs. Relying mainly on the fact that section 39.262 is in the true-up proceeding section, the majority holds that the prohibition found in section 39.262(a) is to be applied only during the 2004 true-up proceedings. This holding is contrary to the both the plain language of the section and the principle that the heading of a section does not limit the specific meaning of a statute.

The phrase "provided by the other sections of this chapter" in section 39.262(a) unambiguously states that the utility not be permitted to overrecover using any mitigation tool during

12

any phase, not just in Phase III's true-up proceedings. Thus, the majority erred by limiting the application of section 39.262(a) to the 2004 true-up proceedings. *See Mega Child Care*, 145 S.W.3d at 177. Furthermore, it is logical that the legislature intended for the prohibition against overrecovery to apply at the time that the Commission is instructed to review an updated ECOM model to evaluate how effective the accelerated recovery of stranded costs has been during Phase I. If adjustments are needed as the competitive market begins in Phase II, why would the Commission only be allowed to increase but not decrease a utility's recovery of stranded costs at that time? Logically, the 2002 adjustment contemplating the imposition of a CTC if stranded costs remain after mitigation is an adjustment after Phase I, while the true-up proceeding is an adjustment to review the affect of the CTC on remaining stranded costs. The true-up proceeding will reconcile any stranded costs not recovered through the CTC and mitigation. *See* Tex. Util. Code Ann. §§ 39.251-.265 (West Supp. 2004-05) (true-up section 39.262(a) is part of Subchapter F titled, Recovery of Stranded Costs Through Competition Transition Charges).

Moreover, the fact that the obligation to prevent overrecovery is found in the true-up proceeding section of the statute does not, by itself, limit its application as the majority suggests. *See* Tex. Gov't Code Ann. § 311.024. The title of this section does not control over its language because the legislature placed statutes inconsistently throughout chapter 39. *See In re TXU*, 67 S.W.3d at 149 n.18 (Brister, J., concurring) ("For example, section 39.201(l) concerning the tools available at the true-up is located in the section concerning rate-setting for 2002. Conversely, section 39.262(b) concerning annual reports by certain utilities beginning in 2002 is located in the section concerning the true-up beginning in 2004.").

13

Section 39.262(a) sets forth the overarching principle that a utility should not be allowed to overrecover stranded costs. The plain language of the section does not limit when the Commission may act to reverse the overrecovery. The goal of fostering fair and full competition through deregulation can best be accomplished by correcting over-mitigation as competition begins, not by giving the utility with excess retained earnings an unfair advantage for two years. The section is unclear as to how the Commission is to enforce this principle when the interim review based on 2001 data calls for an adjustment to reduce costs recovered. Therefore, I would conclude that we should defer to the Commission's expertise in determining a reasonable method of dealing with the overrecovery of stranded costs at that point, which was the beginning of the competitive market.

### Section 39.254

The majority and AEP insist that utility code section 39.254 orders a utility identified as having stranded costs in the 1998 ECOM Report to mitigate its stranded costs each year during the recovery scheme, even if interim estimates suggest that the utility has overrecovered at some point. However, section 39.254 only states which utilities may use the legislatively provided tools to recover stranded costs; it does not state that a utility can continue to mitigate stranded costs based on the 1998 estimates when the utility no longer has projected stranded costs. *See id.* § 39.254; *In re TXU*, 67 S.W.3d at 146 (Brister, J., concurring). Section 39.254 is ambiguous as to which stranded costs a utility is to mitigate each year. *See In re TXU*, 67 S.W.3d at 146 (Brister, J., concurring).

The stranded cost recovery scheme calls for a mid-course correction after Phase I. If stranded costs remain, the Commission must impose, before the competitive market begins, a

14

CTC. But if a utility's mitigation efforts during Phase I have worked too well, the utility is not permitted to retain its windfall, and the Commission must act at that time to prevent the overrecovery generated by the mitigation tools.

The majority argues that a utility's mitigation efforts are to be based on the 1998 stranded cost estimates and that the legislature intended for the Commission to deal with any over- or underrecovery of stranded costs at the 2004 true-up proceedings. The majority's construction, however, leads to the absurd result in which the Commission is required to rely on interim stranded cost projections to increase a utility's recovery by imposing a CTC, but must ignore those very same projections when a reduction in recovery is required. *See Utts v. Short*, 81 S.W.3d 822, 832 (Tex. 2002) ("[W]e must not construe statutes in a way that would lead to an absurd result."). Furthermore, the majority's construction of section 39.254 is in direct conflict with the plain language of section 39.262(a). In light of section 39.254's ambiguity, I would hold that we should defer to the Commission's construction that section 39.262(a) mandates that it prevent a utility from overrecovering stranded costs using mitigation tools during Phase I by reversing a windfall at the time it is discovered, not two years later.

## CONCLUSION

Essentially, the majority avers that it was improper for the Commission to imply the authority to order refunds of stranded costs based on estimates projected between Phase I and Phase II because the legislature did not explicitly grant the Commission a tool for doing so. However, the legislature did not explicitly forbid it from doing so either. Thus, the issue here is whether it was reasonable for the Commission to imply the power to order the refunds. *See City of Austin*, 92

15

S.W.3d at 441-42 (Commission has powers expressly conferred upon it by legislature and any implied powers necessary to accomplish its express duties). The legislature mandated that the Commission prevent a utility from using any of the tools provided in Chapter 39 to overrecover stranded costs and implement deregulation in a manner that promotes competition among all providers of electricity. Moreover, ordering the refunds did not conflict with any express provision, or the overall intent, of PURA Chapter 39. For all the reasons set forth, the Commission's construction of the statute and its obligations under the statute is reasonable. Therefore, it is entitled to deference by this Court. The majority's construction of the statute may be reasonable as well, but an agency's interpretation need not be the only permissible interpretation to be entitled to deference. The majority may not substitute its judgment for that of the Commission's in addressing a circumstance not specifically addressed in the statute. This Court must defer to the Commission's interpretation in this complex transition from regulation to deregulation of the electric industry. Accordingly, I respectfully dissent.

Bea Ann Smith, Justice

Before Justices B. A. Smith, Patterson and Pemberton

Filed: September 23, 2005

16