TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-03-00458-CV






Anderson-Clayton Bros. Funeral Home, Inc.; Restland of Dallas, Inc.; Restland Funeral

Home; Singing Hills Funeral Home, Inc.; Laurel Land Funeral Home of

Forth Worth, Inc.; Blue Bonnet Hills Funeral Home, Inc.; and

Blue Bonnet Hills Memorial Park, Inc., Appellants


v.


Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas; and Greg
Abbott, Attorney General of the State of Texas, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT

NO. 9912183, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING


 



O P I N I O N 



 In this case, we address a rare uncertainty concerning death and taxes: the franchise
tax treatment of earnings from out-of-state investments made by Texas prepaid funeral benefits trusts
maintained by Texas funeral homes. Appellants, a group of affiliated funeral homes ("Anderson-Clayton"), took the position that these types of earnings were out-of-state receipts for franchise tax
apportionment purposes. The Comptroller of Public Accounts audited Anderson-Clayton and
disagreed, contending the earnings were instead Texas receipts. This resulted in a much higher
franchise tax bill for Anderson-Clayton. A taxpayer suit ensued, and the Comptroller and Attorney
General (Comptroller) prevailed below on cross-motions for summary judgment. We affirm the
district court's summary judgment. 


BACKGROUND


 To hopefully simplify and clarify the tax law concepts at issue in this case, we first
survey the basic features of prepaid funeral benefits trusts and the Texas franchise taxation system.


Prepaid funeral services

 Among the services it offers related to death and burial, Anderson-Clayton permits
individuals to prearrange their own funerals, or that of another beneficiary, by purchasing a fixed
price contract for future funeral services to be provided after the beneficiary's death. Texas has long
regulated these types of prepaid funeral benefits by statute to "provide all safeguards to protect the
prepaid funds and to assure that the funds will be available to pay for prearranged funeral services." (1) 
These safeguards include a requirement that funeral homes quickly deposit proceeds from customers'
purchases of prepaid funeral benefits contracts either:



 in a savings and loan in Texas, in an interest-bearing account insured by the
federal government;

 in a bank in Texas, in an interest-bearing account insured by the federal
government; or

 with the trust department of a bank in Texas, or in a trust company authorized
to do business in Texas, to be invested by the trust department . . . .


Tex. Fin. Code Ann. § 154.253(a) (West 1998). (2) Each type of account is carried in the name of the
funeral provider to whom the purchaser makes payment. Id. § 154.253(b). The funeral provider
must maintain the original purchase payments in the account until either (1) the purchaser
(consumer) cancels the contract; or (2) the beneficiary dies and the funeral services are provided. 
Id. §§ 154.254, .262 (West 1998). 

 During the interim between the deposit of the funds and cancellation or performance
of the contract, the trustee of a prepaid funeral benefits trust account must prepare an investment plan
and place the funds in certain categories of investments, including secure stocks, bonds and money-market accounts. Id. §§ 154.257, .258 (West Supp. 2002). Earnings on these investments are paid
into the trust accounts and generally remain until either the contract is cancelled or the beneficiary
dies and the contract is performed. However, unlike the original purchase payments, the trust
investment earnings can be used by the funeral provider to pay certain expenses, id. § 154.261 (West
1998), and can be withdrawn and retained by the funeral provider after the contract is cancelled or
performed. Id. § 154.263 (West 1998).


Texas franchise taxes 

 Texas imposes a franchise tax on corporations for what is seen as a privilege
bestowed upon them by the State allowing them to do business here. See Tex. Tax Code Ann.
§ 171.001(a)(1) (West Supp. 2004); Bullock v. National Bancshares Corp., 584 S.W.2d 268, 270
(Tex. 1979). The tax is imposed on "each corporation that does business in this state," is chartered
in Texas, or is authorized to do business in Texas. See Tex. Tax Code Ann. § 171.001.

 Prior to 1992, the Texas franchise tax was assessed based solely on a corporation's
taxable capital. As a result, capital-intensive industries (in contrast to industries, e.g., services, that
require fewer fixed assets) bore the brunt of the tax, even in unprofitable years. See General
Dynamics Corp. v. Sharp, 919 S.W.2d 861, 863 (Tex. App.--Austin 1996, writ denied). In 1991,
the Texas Legislature sought to broaden the franchise tax base by adding "net taxable earned
surplus" as an additional basis for assessment. See Act of Aug. 12, 1991, 72d Leg., 1st C.S., ch. 5,
§ 8.02, 1991 Tex. Gen. Laws 134, 152.

 Simply described, "net taxable earned surplus" is determined by (1) adjusting the
amount of a corporate taxpayer's reportable federal taxable income to yield "taxable earned surplus,"
(2) "apportioning" or attributing the taxable earned surplus to Texas; and (3) subtracting various
allowable deductions from the apportioned taxable earned surplus. Tex. Tax Code Ann.
§ 171.110(a) (West Supp. 2004). Apportionment, the second step, is at the center of the present
dispute.

 Under tax code sections 171.106 and 171.110(a)(2), taxable earned surplus is to be
"apportioned" to Texas by multiplying it by a fraction, the numerator of which is the corporation's
"gross receipts from business done in this state," as determined under section 171.1032, tax code,
and the denominator of which is the corporation's "gross receipts from its entire business," as
determined under section 171.1051. Id. §§ 171.106(b), 171.110(a)(2). (3) Thus, the larger a
corporation's "gross receipts from business done in this state," the larger the apportionment factor,
and the larger percentage of its taxable earned surplus is subject to the franchise tax. 

 "Gross receipts from business done in this state," in turn, is comprised of the
corporation's receipts from several enumerated categories of transactions occurring in Texas, plus
"other business done in this state." Id. § 171.1032. Similarly, "gross receipts from . . . entire
business" includes a corporation's receipts from several enumerated categories of transactions
occurring either in Texas or elsewhere, including "other business." Id. § 171.1051. Earnings from
intangibles, such as the investment earnings at issue here, are considered to be "other business done
in this state" or "other business," depending on whether the earnings are deemed to be from Texas
or elsewhere. Humble Oil & Refining Co. v. Calvert, 414 S.W.2d 172, 173 (Tex. 1967). To
determine the geographic origin of such earnings, Texas courts have long applied the "location of
the payor" rule: "the domicile of the debtor or payor in the case of interest and the declaring
corporation in the case of dividends is regarded as the location of the business receipt without regard
to the domicile of the payee." Id. at 175; Bullock, 584 S.W.2d at 270 ("To determine what receipts
from intangibles should be allocated to business done in this state, Texas employs the location of
payor test."); see also 34 Tex. Admin. Code § 3.557 (e)(13)(B)-(E) (West 1992). 

 Furthermore, Section 171.1121, tax code, defines "gross receipts for taxable earned
surplus." As contrasted with sections 171.1032 and 171.1051, which identify the business
transactions from which "gross receipts from business done in this state" and "gross receipts from
. . . entire business," respectively, are derived, section 171.1121 sets forth the accounting principles
governing how these two categories of "gross receipts" are to be calculated. "Gross receipts" include
all revenues reportable by a corporation on its federal tax return, without certain deductions, but not
including revenues that are not included in taxable earned surplus. Tex. Tax Code Ann.
§ 171.1121(a) (West 2002). Subsection (b) of section 171.1121 provides that "a corporation shall
use the same accounting methods to apportion taxable earned surplus as used in computing
reportable federal taxable income." Id. § 171.1121(b). Subsection (c) prohibits consolidated
reporting, requiring corporations to report only their own gross receipts, and subsection (d) restricts
the ability of corporations to change their accounting methods used to calculate gross receipts. Id.
§ 171.1121(c) & (d). Additional provisions address the accounting treatment of a corporation's
shares of a partnership's gross receipts. Id. § 171.1121(e) & (f).


The present controversy

 This case arises from Anderson-Clayton's franchise tax treatment of investment
earnings on its prepaid funeral benefits trusts during the 1993-96 tax years. Throughout this period,
Anderson-Clayton deposited proceeds from its sale of prepaid funeral benefits contracts into Texas
trusts, in accordance with Texas Finance Code section 154.253(a)(3), and these trusts, in turn,
invested those funds in accordance with Texas Finance Code section 154.258 and accumulated
investment earnings. It is undisputed that, at all relevant times, the investment earnings on
Anderson-Clayton's prepaid funeral benefits trusts came from out-of-state corporations.

 During the period in dispute, Anderson-Clayton took the position that the out-of-state
corporations, and not the Texas trusts, were the relevant payors, making the earnings out-of-state
receipts and not those from "other business done in this state." Anderson-Clayton apparently based
this understanding on the federal income tax treatment of the investment earnings. The parties do
not dispute that, under federal income tax law, the investment earnings from Anderson-Clayton's
prepaid funeral benefits trusts were properly reportable as income of Anderson-Clayton, as opposed
to the trust into which the earnings were paid. In other words, the trusts were simply disregarded and
the investment earnings treated as if they flowed directly from the out-of-state investment vehicles
to Anderson-Clayton. (4)

 In 1997, the Comptroller audited Anderson-Clayton for franchise tax compliance. 
The Comptroller determined that the investment earnings should instead have been treated as Texas
receipts, resulting in an additional total franchise tax liability for Anderson-Clayton of $420,077.07
for the 1993-96 tax years. The record indicates that the Comptroller may have reached this
determination by erroneously applying the rule governing taxation of taxable capital, not taxable
earned surplus. Compare 34 Tex. Admin. Code § 3.549 (West 1992), with 34 Tex. Admin Code
§ 3.557 (West 1992). The Comptroller's rule dealing with taxable capital explicitly provides that
income earned from trusts accounts located in Texas "are apportioned to the legal domicile of the
trust." 34 Tex. Admin. Code § 3.549(e)(47). The companion rule concerning earned-surplus income
in effect during the relevant time period does not contain a similar provision. Id. § 3.557. (5) 
Nonetheless, Anderson-Clayton appears to concede that such an error was immaterial if the
Comptroller ultimately reached the correct result in assessing the tax.

 After exhausting administrative remedies, Anderson-Clayton paid the taxes under
protest and filed a taxpayer suit in Travis County district court to recover what was by then a total
of $515,074.88 in franchise taxes, interest, and penalties paid under protest. The parties filed cross-motions for summary judgment that centered on the sourcing issue. After a hearing, the district court
granted the Comptroller's motion and denied Anderson-Clayton's motion in full. This appeal
ensued.


DISCUSSION


Standard of review

 Because the propriety of a summary judgment is a question of law, we review the trial
court's decision de novo. Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994); Texas Dep't
of Ins. v. American Home Assurance Co., 998 S.W.2d 344, 347 (Tex. App.--Austin 1999, no pet.). 
The parties agree there are no disputes of material fact in this case and that it turns entirely on
statutory construction, a question of law. See Texas Dep't of Transp. v. Needham, 82 S.W.3d 314,
318 (Tex. 2002).

 When parties file cross-motions for summary judgment, each party in support of its
motion necessarily takes the position that there is no genuine issue of fact in the case and that it is
entitled to judgment as a matter of law. Ackermann v. Vordenbaum, 403 S.W.2d 362, 364 (Tex.
1966); City of Pflugerville v. Capital Metro. Transp. Auth., 123 S.W.3d 106, 110 (Tex.
App.--Austin 2003, pet. denied). Thus, where, as here, both parties file a motion for summary
judgment, and one is granted and one is denied, we determine all questions presented and render
such judgment as the trial court should have rendered. See Commissioners Court v. Agan, 940
S.W.2d 77, 80 (Tex. 1997).


The parties' arguments

 The parties' arguments center on the construction of section 171.1121 of the tax code,
the provisions setting forth the accounting principles under which "gross receipts from business done
in this state" and "gross receipts from . . . entire business" are determined. It provides, in full: 


§ 171.1121. GROSS RECEIPTS FOR TAXABLE EARNED SURPLUS. 


(a) For purposes of this section, "gross receipts" means all revenues reportable by
a corporation on its federal tax return, without deduction for the cost of property
sold, materials used, labor performed, or other costs incurred, unless otherwise
specifically provided in this chapter. "Gross receipts" does not include revenues
that are not included in taxable earned surplus. For example, Schedule C special
deductions and any amounts subtracted from reportable federal taxable income
under Section 171.110(a)(1) are not included in taxable earned surplus and
therefore are not considered gross receipts. 


(b) Except as otherwise provided by this section, a corporation shall use the same
accounting methods to apportion taxable earned surplus as used in computing
reportable federal taxable income. 


(c) A corporation shall report its gross receipts based solely on its own financial
condition. Consolidated reporting is prohibited. 


(d) Unless the provisions of Section 171.111 apply due to an election under that
section, a corporation may not change its accounting methods used to calculate
gross receipts more often than once every four years without the express written
consent of the comptroller. A change in accounting methods is not justified
solely because it results in a reduction of tax liability. 


(e) A corporation's share of a partnership's gross receipts that is included in the
corporation's federal taxable income must be used in computing the
corporation's gross receipts under this section. Unless otherwise provided by
this chapter, a corporation may not deduct costs incurred from the corporation's
share of a partnership's gross receipts. The gross receipts must be apportioned
as though the corporation directly earned them. 



Tex. Tax Code Ann. § 171.112 (a)-(c) (West 2002). The parties' dispute centers on the proper
interpretation of subsection (b).

 Anderson-Clayton urges that subsection (b)'s requirement that it use the same 
"accounting method" to "apportion" taxable earned surplus as it uses in computing its federal taxable
income means that it should disregard the trusts, as it does when computing federal taxable income,
when "sourcing" the trust's investment earnings to either the numerator of the apportionment
formula ("gross receipts from business done in this state," as determined under section 171.1032)
or the denominator ("gross receipts from its entire business," as determined under section 171.1051). 
Id. §§ 171.1032, .1051, .106(b), .110(a)(2). Thus, Anderson-Clayton reasons, it should treat the
investment earnings as direct payments from the out-of-state investment vehicles to it, and,
accordingly, not include those earnings in "gross receipts from business done in this state."

 The Comptroller's position regarding subsection (b) has continued to evolve during
this appeal. (6) The Comptroller presently argues that subsection (b) is not intended to address sourcing
of receipts under Sections 171.106, 171.1032 and 171.1051, but only when gross receipts and related
earned surplus income are recognized. The Comptroller asserts that there are several appropriate
methods of accounting that a company could use to determine its reportable federal income. Some
of these methods allow income and expenses to be deferred such as by use of installment,
percentage-of-completion, or completed-contract accounting. The Comptroller urges that subsection
(b) merely requires taxpayers to use the same method of accounting they use to compute federal
reportable taxable income to determine when to recognize earned surplus for franchise tax purposes. 
The question of where or from whom the investment earnings are deemed to emanate, the
Comptroller maintains, is instead determined by Texas tax and trust law, which considers trusts to
be separate entities.


Section 171.1121(b)

 Statutory construction principles

 When construing a Texas statute, our paramount task is to ascertain the Texas
Legislature's intent in enacting that provision. We first look to the plain and common meaning of
the words the legislature used. Tex. Gov't Code Ann. § 311.011 (West 1998); Kroger Co. v. Keng,
23 S.W.3d 347, 349 (Tex. 2000); Texas Workers' Comp. Comm'n v. Texas Builders Ins. Co., 994
S.W.2d 902, 908 (Tex. App.--Austin 1999, pet. denied). We are to presume that every word in a
statute has been used for a purpose and that each word, phrase, clause, and sentence should be given
effect. Cities of Austin, Dallas, Ft. Worth and Hereford v. Southwestern Bell Telephone Co., 92
S.W.3d 434, 442 (Tex. 2002); see State v. Evangelical Lutheran Good Samaritan Soc'y, 981 S.W.2d
509, 511 (Tex. App.--Austin 1998, no pet.). Unless a statute is ambiguous, we abide by the clear
language of the statute and enforce it as written. RepublicBank Dallas, N.A. v. Interkal, Inc., 691
S.W.2d 605, 607 (Tex. 1985).

 Also, the legislature has prescribed that "[w]ords and phrases that have acquired a
technical or particular meaning, whether by legislative definition or otherwise, shall be construed
accordingly." Tex. Gov't Code Ann.§ 311.011(b) (West 1998) (Code Construction Act). The Code
Construction Act also requires us to consider, among other things, statutory provisions on the same
or similar subjects. Id. § 312.008 (West 1998). And, "[w]hen the same or a similar term is used in
the same connection in different statutes, the term will be given the same meaning in one as in the
other, unless there is something to indicate that a different meaning was intended." Guthery v.
Taylor, 112 S.W.3d 715, 722 (Tex. App.--Houston [14th Dist.] 2003, no pet.). 

 Finally, while the term "apportion" in section 171.1121(b) is critical, we are not to
view this term in isolation, but in context with the Texas franchise tax law as a whole. Fitzgerald
v. Advanced Spine Fixation Sys., 996 S.W.3d 864, 866 (Tex. 1999); Thomas v. Cornyn, 71 S.W.3d
473, 481 (Tex. App.--Austin 2002, no pet.). Additionally, the Code Construction Act authorizes
us to consider the "object sought to be attained" by the legislature when enacting the provision. Tex.
Gov't Code Ann. § 311.023 (West 1998); see also In re Bell, 91 S.W.3d 784, 787 (Tex. 2002) ("[The
Act] makes clear that courts may consider the "legislative history" and the "object sought to be
attained" in construing statutes.").


 Application

 Applying these principles of statutory construction convinces us that the legislature
did not intend section 171.1121(b) to govern the sourcing of gross receipts to either "gross receipts
from business done in this state" or "gross receipts from its entire business" in the earned surplus
apportionment factor. Tex. Tax Code Ann. §§ 171.1032, .1051, .106(b), .110(a)(2).

 Although the parties have focused almost exclusively on the meaning of "apportion"
in section 171.1121(b), that provision in fact contains two terms that are decisive in our analysis:
corporations must "use the same accounting methods to apportion taxable earned surplus as used
in computing reportable federal taxable income." We turn first to "accounting methods."

 Because both earned surplus, the tax base, and the "gross receipts" used in
apportioning it are derived from federal taxable income, the meaning of "accounting method" in the
Internal Revenue Code is especially instructive in our construction of section 171.1121(b). The
Code Construction Act requires us to consider, among other things, statutory provisions on the same
or similar subjects. Tex. Gov't Code Ann. § 312.008 (West 1998). In its "General rule for methods
of accounting" in the Internal Revenue Code, Congress listed several "permissible methods,"
including cash and accrual methods. 26 U.S.C.A. § 446(c). Under cash accounting, income is
recognized only upon the actual receipt of cash, property or services. By contrast, under accrual
methods of accounting, income is recognized when all of the events occur that fix the right to receive
income and determine its amount with reasonable accuracy. 26 U.S.C.A § 446(c) (West 2002); 26
C.F.R. 1.446-1(c)(ii); Tax Management Portfolio, Accounting Methods--General Principles, No.
570 T.M. (2003), at A-24. (7) Numerous variants on accrual methods can be used, including the
installment method (a method of assigning to particular tax years income from the sale of property
for which payment is made over time) (8) and the percentage of completion method (a method of
allocating costs and income from the performance of long-term contracts to particular taxable
years). (9)

 As these example illustrate, "accounting methods" as contemplated in the franchise
tax statute relate primarily to the timing of revenue and income recognition. The linchpin of
Anderson-Clayton's argument--that a grantor trust is treated as a flow-through for federal income
tax recognition purposes--is instead a matter of substantive federal tax law governing whether tax
liability is imposed on the trust or the grantor. Anderson-Clayton thus errs in extrapolating from this
"accounting method" a Texas sourcing methodology. 

 Nor does the term "apportion" as used in section 171.1121(b) suggest anything about
sourcing. The legislature gave "apportion" a technical definition that we must apply in lieu of the
more general meaning on which the dissent relies. Ante at ___; see Tex. Govt. Code § 311.011(b). 
"Apportion" refers to the processes outlined in section 171.106. As detailed previously, section
171.106 provides that "taxable earned surplus" (as defined in section 171.110(a)) is "apportioned"
to Texas by multiplying it by the fraction of "gross receipts from business done in this state" (as
determined under section 171.1032) divided by "gross receipts from its entire business" (as
determined under section 171.1051). Id. §§ 171.1032, .1051, .106(b), .110(a)(2). None of these
provisions speak to how receipts are initially categorized as either "gross receipts from business done
in this state" or "gross receipts from . . . entire business." The legislature appears to have left that
preliminary inquiry to other law.

 As for what section 171.1121(b) might mean, we think it merely requires corporations
to apply the same accounting method (e.g., the installment method, the percentage of completion
method) when calculating both reportable federal taxable income and the "gross receipts" it uses in
the apportionment factor of section 171.106. The legislature's evident intent in doing so stems from
the fact that both "gross receipts" used in the earned surplus apportionment factor and the taxable
earned surplus that is being apportioned are derived from items reportable on the corporation's
federal income tax return. Id. §§ 171.110(a), .1121(a). Taxable earned surplus is determined by:


determining the corporation's reportable federal taxable income, subtracting from
that amount any amount excludable under Subsection (k), any amount included in
reportable federal taxable income under Section 78 or Sections 951-964, Internal
Revenue Code, and dividends received from a subsidiary, associate, or affiliated
corporation that does not transact a substantial portion of its business or regularly
maintain a substantial portion of its assets in the United States, and adding to that
amount any compensation of officers or directors, or if a bank, any compensation of
directors and executive officers, to the extent excluded in determining federal taxable
income to determine the corporation's taxable earned surplus; 

Id. § 171.110(a) (emphasis added). "Gross receipts" used in the earned surplus apportionment
factor:


means all revenues reportable by a corporation on its federal tax return, without
deduction for the cost of property sold, materials used, labor performed, or other
costs incurred, unless otherwise specifically provided in this chapter. "Gross receipts"
does not include revenues that are not included in taxable earned surplus. For
example, Schedule C special deductions and any amounts subtracted from reportable
federal taxable income under Section 171.110(a)(1) are not included in taxable
earned surplus and therefore are not considered gross receipts. 



Id. § 171.1121(a) (emphasis added). As noted previously, a corporation may choose among several
potential accounting methods when calculating its federal taxable revenues and income. If a
corporation used inconsistent accounting methods to calculate "reportable federal taxable income"
(the foundation of taxable earned surplus) and the "revenues reportable by a corporation on its
federal income tax return" (used in calculating "gross receipts" for apportionment), it could
conceivably recognize revenues and income for the current tax year in calculating one of these
figures, yet recognize the same revenue and income in a different tax year when calculating the other
figure. The result would be that the corporation would recognize revenues and income for taxable
earned surplus purposes that is not also reflected in the apportionment factor, or vice versa. Either
inconsistency would skew the apportionment process. If, for example, Texas receipts were reflected
in taxable earned surplus for a particular tax year but not also in the corresponding apportionment
factor, earned surplus would be disproportionately under-apportioned to Texas. Conversely, if Texas
receipts are recognized in the apportionment factor but not in the taxable earned surplus being
apportioned for that tax year, taxable earned surplus (not including those unrecognized receipts)
would be disproportionately over-apportioned to Texas. 

 The dissent suggests that this reading of section 171.1121(b) renders that provision
redundant and unnecessary, as section 171.1121(a) already defines "gross revenues" used in the
earned surplus apportionment factor as "all revenues reportable by a corporation on its federal
income tax return" and "does not include revenues that are not included in taxable earned surplus." 
Southwestern Bell Telephone, 92 S.W.3d at 442 ("we will presume that the Legislature used every
word of a statute for a purpose"). We disagree that section 171.1121(a) forecloses the possibility that
a corporation could use inconsistent accounting methods to calculate "revenues reportable . . . on its
federal tax return" for use in apportionment under section 171.1121(a) and another to compute its
"reportable federal taxable income" in determining taxable earned surplus under section
171.110(a)(1). Because a corporation may choose among several accounting methods when
calculating reportable revenues and income on its federal income tax return, the statutory references
to "revenues reportable . . . on its federal income tax return" and "reportable federal taxable income"
do not alone preclude such inconsistent treatment.

 We also find it instructive that, in 1995, the legislature added a provision parallel to
section 171.1121(b) to the provisions governing assessment of franchise tax on the alternative tax
base of taxable capital. Acts 1995, 74th Leg., R.S., ch. 1002, § 13, codified at Tex. Tax. Code Ann
§ 171.112(h). The methods for assessing the franchise tax on taxable capital are largely parallel to
those regarding taxable earned surplus. Both taxable earned surplus and taxable capital are
apportioned to Texas based on a factor of "gross receipts from business done in this state" divided
by "gross receipts from its entire business." Id. §§ 171.106(a) & (b). The receipts to be included
in each apportionment factor derive from virtually identical lists of business activities. Compare id.
§§ 171.103 & .105, with id. §§ 171.1032 & .1051. However, gross receipts used in apportioning
taxable capital are calculated differently than gross receipts used in apportioning taxable earned
surplus. "Gross receipts" used in apportioning taxable capital generally "means all revenues that
would be recognized annually under a generally accepted accounting principles method of
accounting," absent certain deductions. Id. § 171.112(a) & (b). (10) This corresponds to the manner
in which taxable capital, the corresponding tax base, is calculated: under generally accepted
accounting principles. Id. §§ 171.101, 171.109(b); Tex. Bus. Corp. Act Ann. art. 1.02(27). This
linkage of the taxable capital tax base and its apportionment factor via generally accepted accounting
principles is parallel to the linkage, through revenues and income reportable for federal income tax
purposes, of taxable earned surplus and its apportionment factor. (11)

 Prior to 1995, the provisions governing calculation of the taxable capital
apportionment factor did not contain a provision similar to section 171.1121(b). Even before the
amendment, both taxable capital and the gross revenues used in its apportionment factor were to be
calculated based on generally accepted accounting principles. But merely specifying that a
corporation must use a generally accepted accounting method to calculate each of these figures did
not necessarily require the corporation to use the same method as to both, at least as the legislature
viewed the statute. It added the requirement that "a corporation shall use the same accounting
methods to apportion its taxable capital as it used to compute its taxable capital." Acts 1995, 74th
Leg., R.S., ch. 1002, § 13, codified at Tex. Tax. Code Ann § 171.112(h). The legislative history
reveals that this amendment was intended to ensure the same "'parallel accounting treatment'
required for earned surplus." S.B. 644, House Committee Report, Bill Analysis at 1-2.

 Although we are not to rely on the enactments of a subsequent legislature as
authoritative interpretations of a prior statute, Cash America Intern Inc. v. Bennett, 35 S.W.3d 12,
20 (Tex. 2000), we nonetheless find the 1995 amendments helpful in our interpretation of section
171.1121(b). At a minimum, they illustrate that the franchise tax statute would be at least unclear
as to whether it would require "parallel accounting treatment"--the use of the same accounting
method to calculate both the tax base and its apportionment factor--absent the language appearing
in section 171.1121(b) and the 1995 amendment to the taxable capital provisions. Against that
backdrop, we would not construe section 171.1121(b) as merely redundant of section 171.1121(a).
Southwestern Bell Telephone, 92 S.W.3d at 442.

 Because section 171.1121(b) is silent regarding the sourcing of receipts, we must look
to other law to determine whether the income derived from the trusts should be considered a Texas
receipt.


Other law

 Before we turn to other law potentially governing the sourcing of the receipts at issue
in this case, it is helpful to first consider the broader concepts underlying tax apportionment. Because
the franchise tax is imposed on corporations for what is seen as a privilege bestowed upon them by
doing business here, "the formula employed to compute a corporation's franchise tax is designed to
achieve a tax commensurate with the value of the privilege granted"--a formula that taxes only
business done in this state. See Tex. Tax Code Ann. § 171.001(a)(1); Bullock, 584 S.W.2d at 270. 
For many items, such as tangible items of commerce, what is considered to be business done in
Texas is fairly clear--if the corporation received income from a sale of a product in Texas, it is a
Texas receipt. However, for intangible sources of income, the sourcing of income as a Texas receipt
was once unclear. For instance, would income from dividends earned through investments with a
foreign corporation be considered a Texas receipt? The Comptroller answered the "intangible
sourcing" question by adopting the "location of payor" rule as its sourcing method. See Humble Oil,
414 S.W.2d at 173. Because the underlying justification of the franchise tax is predicated on taxing
only benefits received by doing business in Texas, the Comptroller decided that the location of the
payor of the intangible income would determine whether the income was derived from business in
Texas and thus whether the income could be taxed. 

 Ultimately, we must determine whether the income derived from the trusts is properly
considered "other business done in this state" in light of the "location of payor" rule--in other words
whether the trust is the payor. Tex. Tax Code Ann. § 171.1032; Humble Oil, 414 S.W.2d at 173. 
We are mindful that construction of a statute by an administrative agency charged with its
enforcement is entitled to serious consideration, so long as the construction is reasonable and does
not contradict the plain language of the statute. Tarrant Appraisal Dist. v. Moore, 845 S.W.2d 820,
823 (Tex. 1993). If the agency's interpretation is consistent with the language and the purposes of
the statute, the court will accept it, even if other reasonable interpretations exist. See Gene Hamon
Ford, Inc. v. David McDavid Nissan, Inc., 997 S.W.2d 298, 305 (Tex. App.--Austin 1999, pet.
denied). In other words, because the Comptroller has determined that taxing income derived from
trusts located in Texas is an appropriate interpretation of its power to tax "other business done in this
state," we will defer to the Comptroller's conclusion if it is reasonable. Tex. Tax Code Ann.
§ 171.1032.

 Under longstanding Texas law, trusts are considered separate entities, even where
they may not be subject to federal income tax or the franchise tax. See Tex. Prop. Code Ann. ch. 112
(West 1995 & Supp. 2004). Because it is ultimately the trusts, separate and distinct entities, that pay
income to the funeral homes earned from their investments, we conclude that the comptroller's
determination that the trusts are the payors is reasonable. Because it is undisputed that the trusts are
domiciled in Texas, we determine that, according to the location of payor rule, the investment
income derived from the trusts are Texas receipts. We also observe that sourcing the receipts to the
Texas trusts is consistent with the broader policies underlying tax apportionment. By establishing
a Texas trust to hold and invest revenues from its sale of prepaid funeral benefit plans, Anderson-Clayton availed itself of the benefits and protections of Texas law. It is not unreasonable for the
Comptroller to attempt to apportion franchise taxes commensurate with these privileges and benefits. 
Bullock, 584 S.W.2d at 270.

CONCLUSION


 We hold that the district court did not err in granting summary judgment to the
Comptroller and in denying Anderson-Clayton's summary judgment motion. We affirm the district
court's summary judgment.



 

 Bob Pemberton, Justice

Before Justices Kidd, Puryear and Pemberton: Opinion by Justice Pemberton;

 Dissenting Opinion by Justice Puryear

Affirmed

Filed: August 12, 2004

1. Tex. Fin. Code Ann. § 154.001(c) (West 1998); see Acts 1955, 54th Leg., R.S. ch. 512,
§ 13, 1955 Tex. Gen. Laws 1292, 1295. 
2. As discussed below, this case involves the 1993-96 tax years. At that time, the relevant
statutory provisions governing prepaid funeral services were in Article 548b, Texas Revised Civil
Statutes. Effective 1997, these provisions were recodified into the Texas Finance Code. Act of May
22, 1997, 75th Leg., R.S., ch. 1008, § 1, 1997 Tex. Gen. Laws 3091, 3385. Because neither party
suggests there are any substantive differences between the two versions for purposes of this
litigation, we will cite to the finance code for ease of reference.
3. Subsection (c) of section 171.106 provides a similar formula that is specifically addressed
to taxable earned surplus from the sale of management, distribution or administrative services to or
on behalf of a regulated investment company. Tex. Tax Code Ann. § 171.106(c) (West Supp. 2004).
4. Anderson-Clayton apparently reported the investment earnings annually on its federal
income tax returns and, accordingly, also recognized them in calculating its franchise taxes. See
Tex. Tax Code Ann. §§ 171.106(b) (gross receipts from entire business included in denominator),
.110(a) (net taxable earned surplus based on federal taxable income). By contrast, it did not
recognize as income the original payments made by customers to purchase prepaid funeral benefits
contracts until after the contract was either cancelled or performed and Anderson-Clayton actually
withdrew the funds from the account. See Tex. Fin. Code Ann. §§ 154.254, .262 (funds must remain
in trust accounts until contract is cancelled or beneficiary dies). It recognized the payments for
franchise tax purposes at the same time. And, because Anderson-Clayton received the contract
payments for services it provided in Texas, it sourced those payments to Texas. Tex. Tax Code Ann.
§ 171.1032(a)(2).
5. The Comptroller has since redrafted the rule concerning earned-surplus income to
apportion earnings from trust accounts to the legal domicile of the trust. See 28 Tex. Reg 1218
(2002) (codified at 34 Tex. Admin. Code § 3.557 (West 2003)). We do not address the amended
rule.
6. In her initial brief, the Comptroller concluded that subsection (b) did not direct the use of
federal income tax rules to determine where the payor is but rather what portion of earned-surplus
income may be taxed. During oral argument, however, the Comptroller shifted focus to urge this
Court to read subsection (b) of section 171.1121 together with (c), which prohibits consolidated
reporting, to manifest a broader intent to apportion income to each entity and not treat them as flow-throughs. Subsequently, the Comptroller conceded in a post-submission brief that "[c]onsolidated
reporting is not at issue here."
7. Although the comptroller states in her brief that corporations like Anderson-Clayton cannot
use cash accounting to compute federal reportable taxable income, the code's reference to cash
accounting is nonetheless illustrative of the nature of "accounting methods." 
8. 26 U.S.C.A. § 453(c) (West 2002).
9. Id. § 460(b) (West 2002).
10. Where generally accepted accounting principles are unsettled or not sufficiently specific
regarding a practice, the Comptroller is authorized to establish rules to govern the practice. Tex. Tax
Code Ann. § 171.112(b) (West 1998). Also, corporations whose taxable capital is less than $1
million may report its gross receipts according to the method used on its most recent federal income
tax return due before its franchise tax return is due. Id. § 171.112(c).
11. As the Comptroller explained, in commentary just before the effective date of the 1991
amendments to the franchise tax statute authorizing the taxation of earned surplus, "There must be
a link between the element that is being apportioned (taxable capital, earned surplus) and the formula
used to apportion it. To do otherwise could lead to inequitable results." Tex. Comp. Pub. Acc'ts,
Letter No. 9112L1265B01 (Dec. 4, 1991).