# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00182-CV

### City of Pflugerville, Texas, Appellant

### v.

### Capital Metropolitan Transportation Authority, Appellee

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. GV100065, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

---

## O P I N I O N

The City of Pflugerville withdrew from the Capital Metropolitan Transportation Authority ("Capital Metro"), which led to this dispute as to how Pflugerville's financial obligation to Capital Metro should be calculated upon withdrawal. At issue in this case is whether multi-year contracts providing that funding is subject to budget appropriation should be included in the computation of a withdrawing city's financial obligation. Pflugerville asserts that such contracts were not properly included as "contractual obligations," while Capital Metro contends that they were. *See* Tex. Transp. Code Ann. § 451.611(b)(2) (West 1999). This question turns upon statutory interpretation and was presented to the trial court on cross-motions for summary judgment. Because we agree with Capital Metro's interpretation of the statute, we affirm the district court's summary judgment.

**BACKGROUND**

Capital Metro was created pursuant to a confirmation and tax election conducted in 1985. *See id.* §§ 451.656, .659, .661 (West 1999). Pflugerville, along with Austin and several other surrounding jurisdictions, approved the creation of the authority and the levy of a transit-authority sales tax to support it. Pflugerville continued to be a participant member until 2000, when it withdrew pursuant to an election conducted under chapter 451 of the transportation code and chapter 67 of the election code. *See id.* §§ 451.603-.609 (West 1999); *see generally* Tex. Election Code Ann. §§ 67.001-.017 (West 2003).

When a city withdraws from a transit authority, the transportation code requires computation of the city's net financial obligation to the authority as of the date of withdrawal. *See* Tex. Transp. Code Ann. § 451.611 (West 1999). To arrive at this figure, the city's apportioned share of the authority's assets is subtracted from its apportioned share of the authority's gross financial obligations. *See id.* § 451.611(a). Included in the calculation of gross financial obligations is the authority's "outstanding *contractual obligations* for capital or other expenditures, including expenditures for a subsequent year, the payment of which is not made or provided for from the proceeds of notes, bonds, or other obligations." *See id.* § 451.611(b)(2) (emphasis added). If the city has a positive net financial obligation, the Comptroller continues to collect the transit-authority sales tax in the city until the obligation is satisfied. *See id.* § 451.613 (West 1999). The statutory scheme allows for an overcollection of transit sales taxes after a city withdraws because changes in sales tax rates occur at the end of calendar quarters, and it is virtually impossible to stop collections at the

2

precise instant when enough money has been collected to satisfy the city's net financial obligation. If the amount of funds collected from post-withdrawal taxes exceeds the city's net financial obligation, the authority then refunds to the city the amount by which such taxes exceed its net obligation. *See id.* § 451.614(a) (West 1999).

In this case, Capital Metro calculated Pflugerville's net financial obligation as $73,966. Transit-authority sales taxes continued to be collected in Pflugerville until this obligation was satisfied and the transit sales tax ceased being levied. Capital Metro subtracted Pflugerville's net financial obligation from the post-withdrawal collections and remitted the excess of $301,791 to Pflugerville. Pflugerville contends that Capital Metro improperly inflated the calculation of its outstanding obligations by including certain multi-year contracts that provide "funding by Capital Metro is subject to appropriation of funds in the annual budget." Pflugerville insists that all multi-year obligations with this "subject-to-appropriation" clause are not legally binding contractual obligations. The omission of these multi-year contractual obligations would substantially reduce Pflugerville's net financial obligation to Capital Metro.

Pflugerville filed a declaratory judgment suit in Travis County district court seeking a declaration that the phrase "contractual obligations" in section 451.611(b)(2) includes only legally binding promises for payment, to the exclusion of multi-year contracts providing that performance is contingent upon annual appropriation of funds.[1] Pflugerville and Capital Metro filed cross-

---

[1] In district court, Pflugerville contested the inclusion of two other types of contracts: those where future payments or purchases are (1) contingent on Capital Metro applying for and obtaining a federal grant and (2) subject to termination at the will or convenience of Capital Metro. Because

3

motions for summary judgment; the district court granted Capital Metro's motion. This appeal followed.

## DISCUSSION

### *Standard of review*

Because the propriety of a summary judgment is a question of law, we review the trial court's decision *de novo*. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994); *Texas Dep't of Ins. v. American Home Assurance Co.*, 998 S.W.2d 344, 347 (Tex. App.—Austin 1999, no pet.). Similarly, statutory construction is a question of law for the court to decide. *See Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). We therefore review a summary judgment on the basis of statutory construction *de novo*.

When parties file cross-motions for summary judgment, each party in support of its motion necessarily takes the position that there is no genuine issue of fact in the case and that it is entitled to judgment as a matter of law. *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 364 (Tex. 1966). If one motion is granted and the other denied, we must review the summary judgment evidence presented by both sides and determine all questions presented. *Commissioners Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997). We may either affirm the judgment or reverse and render the judgment that the trial court should have rendered. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988).

---

Pflugerville raises only the issue of the subject-to-appropriation contracts on appeal, we restrict our analysis to these kinds of contracts.

*Construction of "contractual obligations"*

In construing a statute, the court's objective is to determine and give effect to the legislature's intent. *Albertson's, Inc. v. Sinclair*, 984 S.W.2d 958, 960 (Tex. 1999). The first step in determining the legislature's intent is to look at the statute's language with the presumption that the legislature intended the plain and common meaning of its words. *See id.* In conducting a plain meaning inquiry, we are to presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect. *Whitelaw v. State*, 29 S.W.3d 129, 131 (Tex. Crim. App. 2000); *see State v. Evangelical Lutheran Good Samaritan Soc'y*, 981 S.W.2d 509, 511 (Tex. App.—Austin 1998, no pet.). We look to the entire act in determining the legislature's intent with respect to a specific provision. *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n*, 616 S.W.2d 187, 190 (Tex. 1981). A court should not give any ambiguous statutory term a meaning that is out of harmony or inconsistent with other provisions in the statute. *See Needham*, 82 S.W.3d at 318. Besides looking to the statute's language, a court may consider other factors to determine the legislature's intent, including: the object sought to be obtained, the legislative history, the consequences of a particular construction, and administrative construction of the statute. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001); *see* Tex. Gov't Code Ann. § 311.023 (West 1998).

At issue in this case is the meaning of the phrase "contractual obligations" as it appears in the statute: "outstanding *contractual obligations* for capital or other expenditures, including expenditures for a subsequent year, the payment of which is not made or provided for from the proceeds of notes, bonds, or other obligations." Tex. Transp. Code Ann. § 451.611(b)(2)

5

(emphasis added). "Contractual obligations" is not defined anywhere in the transportation code. Pflugerville asserts that the phrase includes only legally binding promises for payment or performance and therefore excludes contracts with the following language: "funding after first year of contract is subject to revenue availability and appropriation of funds in the annual budget approved by Capital Metro Board of Directors" and "any purchase . . . is contingent upon the continued availability of appropriations and is subject to cancellation, without penalty, either in whole or in part, if the funds are not appropriated by the Capital Metro Board of Directors or otherwise made available." Pflugerville asserts that contracts with such language are illusory or merely provide Capital Metro the *option* to perform. Such optional and discretionary contracts are not legally binding and thus do not fall within the plain meaning of "contractual obligations." Capital Metro, on the other hand, asserts that "subject to appropriation" contracts should be included in calculating the transit authority's contractual obligations because: the phrase means merely an obligation that arises from a contract, the "subject-to-appropriation" condition exists even without such explicit language in a contract, and the legislature intended to include such multi-year contracts.

Virtually all multi-year contracts entered into by Capital Metro have subject-to-appropriation clauses. Capital Metro claims that it has conformed its contracts to the requirements of Texas law by incorporating these subject-to-appropriation clauses, and that the condition of annual appropriation would exist anyway as a matter of law if not explicitly stated in the contract. It bases this argument on a statute prohibiting a transit authority from conducting any business in a fiscal year until it has adopted an annual operating budget of all major expenditures. *See* Tex. Transp. Code Ann. § 451.102(a) (West 1999) ("A board shall adopt an annual operating budget of all major

6

expenditures by type and amount. The board shall adopt the budget before the beginning of the fiscal year to which the budget applies and before the authority may conduct any business in the fiscal year."). Payment on a multi-year contract necessarily falls within the ambit of "conducting business." Because Capital Metro cannot, therefore, perform on a previously negotiated contract until the budget has been approved and expenditures under that contract provided for in the budget, it follows that by law a transit authority's multi-year contractual obligations are subject to yearly budget appropriation.

Furthermore, Capital Metro argues, many governmental entities routinely use subject-to-appropriation clauses in contracts because of constitutional limitations on the creation of debt by cities and counties, which restrict expenditures to money from current revenues. *See* Tex. Const. art. XI, §§ 5 & 7. For instance, the local government code provides that if a contract contains subject-to-appropriation language, the contract is a commitment of the local government's current revenues only. *See* Tex. Loc. Gov't Code Ann. § 271.903 (West 1999). We believe that Capital Metro's use of subject-to-appropriation clauses in multi-year contracts does nothing more than conform its contracts to the requirements of Texas law. Their use neither gives Capital Metro the unbridled discretion to perform nor renders the contracts illusory. Therefore, Capital Metro's obligations under multi-year, subject-to-appropriation contracts are legally binding.

Pflugerville argues that only Capital Metro's *operating expenses*, as opposed to capital or other expenses, are subject to budget appropriation by law. It bases this argument on the following limitation upon transit authorities: "An authority may not *spend for operations* money in excess of the total amount specified for operating expenses in the annual operating budget." *See*

7

Tex. Transp. Code Ann. § 451.103 (West 1999) (emphasis added). Pflugerville urges that because the statute singles out operating expenditures, other kinds of expenditures are not by law subject to budget appropriation. We conclude that this statute serves merely as a ceiling on annual operations spending; it does not detract from the broad prohibition on conducting business until after an annual budget of all expenditures has been approved. Therefore, we agree with Capital Metro that the condition of appropriation of funds in a transit authority's budget exists by law, even without an explicit subject-to-appropriation clause in such a contract. Based on this foundation, we proceed to consider the legislative intent behind the phrase "contractual obligations."

The transportation code's enumeration of five detailed components of an authority's outstanding obligations indicates a legislative intent that the scope of "obligation" be comprehensive:

(b) An authority's outstanding obligations under Subsection (a)(1)(A) is the sum of:

(1) the obligations of the authority authorized in the budget of, and contracted for by, the authority;

(2) outstanding contractual obligations for capital or other expenditures, including expenditures for a subsequent year, the payment of which is not made or provided for from the proceeds of notes, bonds, or other obligations;

(3) payments due or to become due in a subsequent year on notes, bonds, or other securities or obligations for debt issued by the authority;

(4) the amount required by the authority to be reserved for all years to comply with financial covenants made with lenders, note or bond holders, or other creditors or contractors; and

(5) the amount necessary for the full and timely payment of the obligations of the authority, to avoid a default or impairment of those obligations, including contingent liabilities.

8

Tex. Transp. Code Ann. § 451.611(b). The first component covers contracts already authorized to be performed within the current budget. The second component covers expenditures not yet authorized in the current budget—obligations incurred under contracts entered into after the current year's budget has been authorized or that extend performance beyond the current year. It broadly covers capital and other types of expenditures, but not those that will be paid through the proceeds of bonds and notes. Because this component refers to expenditures for subsequent years, multi-year contracts necessarily fall within its ambit. The distinction between the first and second components is significant: the first refers to obligations *authorized* in the budget while the second refers to obligations *for subsequent years*. Payment on multi-year contracts due beyond the current fiscal year cannot fall within the first component because such payments cannot by law be authorized in the current budget; such expenditures can only be swept into the computation of outstanding obligations under the second component, which specifically addresses expenditures for subsequent years. The third component covers payments outstanding under bonds and notes, while the fourth covers the reserves required to secure those payments. Lastly, the fifth component of outstanding obligations includes any contingent liabilities. Reading all the components together, as a court should when construing part of a statute, we conclude that the intent was to encompass every potential expenditure by a transit authority as an outstanding obligation. In the context of the statute, the phrase "contractual obligations" is reasonably interpreted to mean any obligation undertaken by a transit authority in the form of a contract. By specifically referring to obligations extending beyond the current budget year, the legislature intended to include multi-year contracts. Because virtually all multi-year contracts entered into by Capital Metro contain subject-to-appropriation clauses, the

9

phrase "contractual obligations" would have little or no meaning if such contracts were not to be included in the computation of an authority's outstanding obligations. Courts should avoid a statutory construction that renders all or part of a statute meaningless. *See Continental Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 402 (Tex. 2000).

Pflugerville asserts that the statute's reference to obligations for "subsequent years" is not rendered meaningless if it is read as "other *non-operating* expenditures . . . for subsequent years." However, Pflugerville's reading of the statute would require adding language that is not in the statute. Its reading is based on its argument that only operating expenses are by law subject to appropriation. We have already rejected this proposition. We have also concluded that the legislative intent was broad—the term "other expenditures" would necessarily include operating expenditures in the absence of a clear legislative intent to exclude them. Furthermore, because we conclude that all expenses of a transit authority—operating, capital, and other—are subject to annual budget appropriations, we reject Pflugerville's arguments with respect to the statute's plain meaning.

The legislative history supports our interpretation. Pflugerville argues that the intent behind the refund provision was fairness towards the withdrawing city. Capital Metro asserts that the original intent behind the calculation of a withdrawing community's net financial obligation was to protect creditors and to ensure that the withdrawal of one unit would not impair the obligation of contracts entered into by the authority—the refund provision was added two years later with a different yet non-conflicting intent. We agree.

When the statute was first enacted, the enumeration of the five components of an authority's financial obligations was preceded by the following language:

10

> The withdrawal of a unit of election . . . is subject to the requirements of the federal and state constitutions prohibiting the impairment of contracts. Taxes shall continue to be collected in the unit of election until an amount of taxes equal to the total financial obligations of the unit of election to the authority has been collected.

Act of May 26, 1987, 70th Leg., R.S., ch. 790, § 7, sec. 6F(l), 1987 Tex. Gen. Laws 2774, 2779 (now codified as Tex. Transp. Code Ann. § 451.611(b) (West 1999), cited language deleted in non-substantive codification of statute). Pflugerville's argument relies on a bill analysis and floor report of the 1989 amendment to the statute creating a withdrawing city's right to a refund for its citizens' overpayment in taxes: "This bill . . . establish[es] that, on withdrawal from a transportation authority, a unit of election is entitled to a refund of any amount by which its share of unencumbered assets exceeds *its share* of financial obligations," House Comm. on Transportation, Bill Analysis, Tex. H.B. 563, 71st Leg., R.S. (1989) (emphasis added), and "[a] community that wants to opt out of a transit service it does not use should be allowed to vote on the issue at any time and should be able to get back *its fair share* of what it put in to the system." House Study Group Daily Floor Report, House Research Organization, Tex. H.B. 563, 71st Leg., R.S., (Apr. 4, 1989), at 16-19 (emphasis added).

The statute as originally enacted clearly stated its purpose of preventing the impairment of contracts. A transit authority takes into consideration its participating members and the needs of the entire authority's population when negotiating multi-year contracts. If a withdrawing city did not pay its proportionate share of outstanding contractual obligations, the authority would conceivably not have enough funds to pay for the goods or services and would then

be less likely to perform its contractual obligations.[2]  Despite the words "fair" and "share" used to promote the refund provision in 1989, the refund provision does not contradict the legislature's original intent to require a withdrawing city to continue to pay taxes until its net financial obligation has been paid in full.  We reject Pflugerville's reliance on the legislative history and conclude that the history, rather, weighs in favor of including subject-to-appropriation contracts as "contractual obligations."

Pflugerville's argument that our interpretation allows Capital Metro to sign high-dollar, multi-year contracts as a means to avoid giving refunds to withdrawing cities is merely a hypothetical problem that could be dealt with on a case-by-case basis if and when such abuse occurs. Although we are sympathetic to Pflugerville's argument that by including subject-to-appropriation contracts in the formula, the withdrawing city will in effect be subsidizing the remaining authority members, the same "subsidy" would also result from non-subject-to-appropriation contracts.  Any expenditures made by Capital Metro after a city withdraws—whether obligated by contracts without conditions or by contracts where funding is subject to appropriation—will benefit solely the remaining members.  We thus hold that subject-to-appropriation contracts are properly included in a transit authority's computation of its "contractual obligations."

---

[2]  We recognize that due to the decrease in population and service area resulting from the withdrawal of a city a transit authority will perhaps have less *need* for certain of its contracted-for goods and services, and thus a withdrawing city may end up paying for goods and services that the authority later does not purchase.  However, the record reflects that Capital Metro has yet to cancel a contract because of failure to budget funds for it.

12

## CONCLUSION

The phrase "contractual obligations" as it appears in section 451.611(b)(2) of the transportation code includes obligations undertaken by a transit authority arising under multi-year contracts that are subject to appropriation of funds in the budget of a transit authority. We affirm the trial court's grant of summary judgment in Capital Metro's favor.

_____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed:   October 16, 2003

13