# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00458-CV

**Anderson-Clayton Bros. Funeral Home, Inc.; Restland of Dallas, Inc.; Restland Funeral Home; Singing Hills Funeral Home, Inc.; Laurel Land Funeral Home of Forth Worth, Inc.; Blue Bonnet Hills Funeral Home, Inc.; and Blue Bonnet Hills Memorial Park, Inc., Appellants**

**v.**

**Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas; and Greg Abbott, Attorney General of the State of Texas, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. 9912183, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

In this case, we address a rare uncertainty concerning death and taxes: the franchise tax treatment of earnings from out-of-state investments made by Texas prepaid funeral benefits trusts maintained by Texas funeral homes. Appellants, a group of affiliated funeral homes (AAnderson-Clayton@), took the position that these types of earnings were out-of-state receipts for franchise tax apportionment purposes. The Comptroller of Public Accounts audited Anderson-Clayton and disagreed, contending the earnings were instead Texas receipts. This resulted in a much higher franchise tax bill for Anderson-

Clayton. A taxpayer suit ensued, and the Comptroller and Attorney General (Comptroller) prevailed below on cross-motions for summary judgment. We affirm the district court=s summary judgment.

## BACKGROUND

To hopefully simplify and clarify the tax law concepts at issue in this case, we first survey the basic features of prepaid funeral benefits trusts and the Texas franchise taxation system.

**Prepaid funeral services**

Among the services it offers related to death and burial, Anderson-Clayton permits individuals to prearrange their own funerals, or that of another beneficiary, by purchasing a fixed price contract for future funeral services to be provided after the beneficiary=s death. Texas has long regulated these types of prepaid funeral benefits by statute to Aprovide all safeguards to protect the prepaid funds and to assure that the funds will be available to pay for prearranged funeral services.@[1] These safeguards include a requirement that funeral homes quickly deposit proceeds from customers= purchases of prepaid funeral benefits contracts either:

(1)  in a savings and loan in Texas, in an interest-bearing account insured by the federal government;

(2)  in a bank in Texas, in an interest-bearing account insured by the federal government; or

---

[1] Tex. Fin. Code Ann. ' 154.001(c) (West 1998); *see* Acts 1955, 54th Leg., R.S. ch. 512, ' 13, 1955 Tex. Gen. Laws 1292, 1295.

(3) with the trust department of a bank in Texas, or in a trust company authorized to do business in Texas, to be invested by the trust department . . . .

Tex. Fin. Code Ann. ' 154.253(a) (West 1998).[2] Each type of account is carried in the name of the funeral provider to whom the purchaser makes payment. *Id.* ' 154.253(b). The funeral provider must maintain the original purchase payments in the account until either (1) the purchaser (consumer) cancels the contract; or (2) the beneficiary dies and the funeral services are provided. *Id.* '' 154.254, .262 (West 1998).

During the interim between the deposit of the funds and cancellation or performance of the contract, the trustee of a prepaid funeral benefits trust account must prepare an investment plan and place the funds in certain categories of investments, including secure stocks, bonds and money-market accounts. *Id.* '' 154.257, .258 (West Supp. 2002). Earnings on these investments are paid into the trust accounts and generally remain until either the contract is cancelled or the beneficiary dies and the contract is performed. However, unlike the original purchase payments, the trust investment earnings can be used by

---

[2] As discussed below, this case involves the 1993-96 tax years. At that time, the relevant statutory provisions governing prepaid funeral services were in Article 548b, Texas Revised Civil Statutes. Effective 1997, these provisions were recodified into the Texas Finance Code. Act of May 22, 1997, 75th Leg., R.S., ch. 1008, ' 1, 1997 Tex. Gen. Laws 3091, 3385. Because neither party suggests there are any substantive differences between the two versions for purposes of this litigation, we will cite to the finance code for ease of reference.

the funeral provider to pay certain expenses, *id.* ' 154.261 (West 1998), and can be withdrawn and retained by the funeral provider after the contract is cancelled or performed. *Id.* ' 154.263 (West 1998).

**Texas franchise taxes**

Texas imposes a franchise tax on corporations for what is seen as a privilege bestowed upon them by the State allowing them to do business here. *See* Tex. Tax Code Ann. ' 171.001(a)(1) (West Supp. 2004); *Bullock v. National Bancshares Corp.*, 584 S.W.2d 268, 270 (Tex. 1979). The tax is imposed on Aeach corporation that does business in this state,@ is chartered in Texas, or is authorized to do business in Texas. *See* Tex. Tax Code Ann. ' 171.001.

Prior to 1992, the Texas franchise tax was assessed based solely on a corporation=s taxable capital. As a result, capital-intensive industries (in contrast to industries, *e.g.*, services, that require fewer fixed assets) bore the brunt of the tax, even in unprofitable years. *See General Dynamics Corp. v. Sharp*, 919 S.W.2d 861, 863 (Tex. App.CAustin 1996, writ denied). In 1991, the Texas Legislature sought to broaden the franchise tax base by adding Anet taxable earned surplus@ as an additional basis for assessment. *See* Act of Aug. 12, 1991, 72d Leg., 1st C.S., ch. 5, ' 8.02, 1991 Tex. Gen. Laws 134, 152.

Simply described, Anet taxable earned surplus@ is determined by (1) adjusting the amount of a corporate taxpayer=s reportable federal taxable income to yield Ataxable earned surplus,@ (2) Aapportioning@ or attributing the taxable earned surplus to Texas; and (3) subtracting various allowable deductions from the apportioned taxable earned surplus. Tex. Tax Code Ann. ' 171.110(a) (West Supp. 2004). Apportionment, the second step, is at the center of the present dispute.

4

Under tax code sections 171.106 and 171.110(a)(2), taxable earned surplus is to be Aapportioned@ to Texas by multiplying it by a fraction, the numerator of which is the corporation=s Agross receipts from business done in this state,@ as determined under section 171.1032, tax code, and the denominator of which is the corporation=s Agross receipts from its entire business,@ as determined under section 171.1051. *Id.* '' 171.106(b), 171.110(a)(2).[3] Thus, the larger a corporation=s Agross receipts from business done in this state,@ the larger the apportionment factor, and the larger percentage of its taxable earned surplus is subject to the franchise tax.

AGross receipts from business done in this state,@ in turn, is comprised of the corporation=s receipts from several enumerated categories of transactions occurring in Texas, plus Aother business done in this state.@ *Id.* ' 171.1032. Similarly, Agross receipts from . . . entire business@ includes a corporation=s receipts from several enumerated categories of transactions occurring either in Texas or elsewhere, including Aother business.@ *Id.* ' 171.1051. Earnings from intangibles, such as the investment earnings at issue here, are considered to be Aother business done in this state@ or Aother business,@ depending on whether the earnings are deemed to be from Texas or elsewhere. *Humble Oil & Refining Co. v. Calvert*, 414 S.W.2d 172, 173 (Tex. 1967). To determine the geographic origin of such earnings, Texas courts have long applied the Alocation of the payor@ rule: Athe domicile of the debtor or payor in the case of interest and the declaring corporation in the case of dividends

---

[3] Subsection (c) of section 171.106 provides a similar formula that is specifically addressed to taxable earned surplus from the sale of management, distribution or administrative services to or on behalf of a regulated investment company. Tex. Tax Code Ann. ' 171.106(c) (West Supp. 2004).

5

is regarded as the location of the business receipt without regard to the domicile of the payee.@ *Id.* at 175; *Bullock*, 584 S.W.2d at 270 (ATo determine what receipts from intangibles should be allocated to business done in this state, Texas employs the location of payor test.@); *see also* 34 Tex. Admin. Code ' 3.557 (e)(13)(B)-(E) (West 1992).

Furthermore, Section 171.1121, tax code, defines Agross receipts for taxable earned surplus.@ As contrasted with sections 171.1032 and 171.1051, which identify the business transactions from which Agross receipts from business done in this state@ and Agross receipts from . . . entire business,@ respectively, are derived, section 171.1121 sets forth the accounting principles governing how these two categories of Agross receipts@ are to be calculated. AGross receipts@ include all revenues reportable by a corporation on its federal tax return, without certain deductions, but not including revenues that are not included in taxable earned surplus. Tex. Tax Code Ann. ' 171.1121(a) (West 2002). Subsection (b) of section 171.1121 provides that Aa corporation shall use the same accounting methods to apportion taxable earned surplus as used in computing reportable federal taxable income.@ *Id.* ' 171.1121(b). Subsection (c) prohibits consolidated reporting, requiring corporations to report only their own gross receipts, and subsection (d) restricts the ability of corporations to change their accounting methods used to calculate gross receipts. *Id.* ' 171.1121(c) & (d). Additional provisions address the accounting treatment of a corporation=s shares of a partnership=s gross receipts. *Id.* ' 171.1121(e) & (f).

**The present controversy**

6

This case arises from Anderson-Clayton=s franchise tax treatment of investment earnings on its prepaid funeral benefits trusts during the 1993-96 tax years. Throughout this period, Anderson-Clayton deposited proceeds from its sale of prepaid funeral benefits contracts into Texas trusts, in accordance with Texas Finance Code section 154.253(a)(3), and these trusts, in turn, invested those funds in accordance with Texas Finance Code section 154.258 and accumulated investment earnings. It is undisputed that, at all relevant times, the investment earnings on Anderson-Clayton=s prepaid funeral benefits trusts came from out-of-state corporations.

During the period in dispute, Anderson-Clayton took the position that the out-of-state corporations, and not the Texas trusts, were the relevant payors, making the earnings out-of-state receipts and not those from Aother business done in this state.@ Anderson-Clayton apparently based this understanding on the federal income tax treatment of the investment earnings. The parties do not dispute that, under federal income tax law, the investment earnings from Anderson-Clayton=s prepaid funeral benefits trusts were properly reportable as income of Anderson-Clayton, as opposed to the trust into which

7

the earnings were paid. In other words, the trusts were simply disregarded and the investment earnings treated as if they flowed directly from the out-of-state investment vehicles to Anderson-Clayton.[4]

_____

[4] Anderson-Clayton apparently reported the investment earnings annually on its federal income tax returns and, accordingly, also recognized them in calculating its franchise taxes. *See* Tex. Tax Code Ann. '' 171.106(b) (gross receipts from entire business included in denominator), .110(a) (net taxable earned surplus based on federal taxable income). By contrast, it did not recognize as income the original payments made by customers to purchase prepaid funeral benefits contracts until after the contract was either cancelled or performed and Anderson-Clayton actually withdrew the funds from the account. *See* Tex. Fin. Code Ann. '' 154.254, .262 (funds must remain in trust accounts until contract is cancelled or beneficiary dies). It recognized the payments for franchise tax purposes at the same time. And, because Anderson-Clayton received the contract payments for services it provided in Texas, it sourced those payments to Texas. Tex. Tax Code Ann. ' 171.1032(a)(2).

In 1997, the Comptroller audited Anderson-Clayton for franchise tax compliance. The Comptroller determined that the investment earnings should instead have been treated as Texas receipts, resulting in an additional total franchise tax liability for Anderson-Clayton of $420,077.07 for the 1993-96 tax years. The record indicates that the Comptroller may have reached this determination by erroneously applying the rule governing taxation of taxable capital, not taxable earned surplus. *Compare* 34 Tex. Admin. Code ' 3.549 (West 1992), *with* 34 Tex. Admin Code ' 3.557 (West 1992). The Comptroller=s rule dealing with taxable capital explicitly provides that income earned from trusts accounts located in Texas Aare apportioned to the legal domicile of the trust.@ 34 Tex. Admin. Code ' 3.549(e)(47). The companion rule concerning earned-surplus income in effect during the relevant time period does not contain a similar provision. *Id.* ' 3.557.[5] Nonetheless, Anderson-Clayton appears to concede that such an error was immaterial if the Comptroller ultimately reached the correct result in assessing the tax.

After exhausting administrative remedies, Anderson-Clayton paid the taxes under protest and filed a taxpayer suit in Travis County district court to recover what was by then a total of $515,074.88 in franchise taxes, interest, and penalties paid under protest. The parties filed cross-motions for summary judgment that centered on the sourcing issue. After a hearing, the district court granted the Comptroller=s motion and denied Anderson-Clayton=s motion in full. This appeal ensued.

---

[5] The Comptroller has since redrafted the rule concerning earned-surplus income to apportion earnings from trust accounts to the legal domicile of the trust. *See* 28 Tex. Reg 1218 (2002) (codified at 34 Tex. Admin. Code ' 3.557 (West 2003)). We do not address the amended rule.

## DISCUSSION

### Standard of review

Because the propriety of a summary judgment is a question of law, we review the trial court=s decision *de novo. Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994); *Texas Dep=t of Ins. v. American Home Assurance Co.*, 998 S.W.2d 344, 347 (Tex. App.CAustin 1999, no pet.). The parties agree there are no disputes of material fact in this case and that it turns entirely on statutory construction, a question of law. *See Texas Dep=t of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002).

When parties file cross-motions for summary judgment, each party in support of its motion necessarily takes the position that there is no genuine issue of fact in the case and that it is entitled to judgment as a matter of law. *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 364 (Tex. 1966); *City of Pflugerville v. Capital Metro. Transp. Auth.*, 123 S.W.3d 106, 110 (Tex. App.CAustin 2003, pet. denied). Thus, where, as here, both parties file a motion for summary judgment, and one is granted and one is denied, we determine all questions presented and render such judgment as the trial court should have rendered. *See Commissioners Court v. Agan*, 940 S.W.2d 77, 80 (Tex. 1997).

### The parties= arguments

The parties= arguments center on the construction of section 171.1121 of the tax code, the provisions setting forth the accounting principles under which Agross receipts from business done in this state@ and Agross receipts from . . . entire business@ are determined. It provides, in full:

' 171.1121. GROSS RECEIPTS FOR TAXABLE EARNED SURPLUS.

(a) For purposes of this section, Agross receipts@ means all revenues reportable by a corporation on its federal tax return, without deduction for the cost of property sold, materials used, labor performed, or other costs incurred, unless otherwise specifically provided in this chapter. AGross receipts@does not include revenues that are not included in taxable earned surplus. For example, Schedule C special deductions and any amounts subtracted from reportable federal taxable income under Section 171.110(a)(1) are not included in taxable earned surplus and therefore are not considered gross receipts.

(b) Except as otherwise provided by this section, a corporation shall use the same accounting methods to apportion taxable earned surplus as used in computing reportable federal taxable income.

(c) A corporation shall report its gross receipts based solely on its own financial condition. Consolidated reporting is prohibited.

(d) Unless the provisions of Section 171.111 apply due to an election under that section, a corporation may not change its accounting methods used to calculate gross receipts more often than once every four years without the express written consent of the comptroller. A change in accounting methods is not justified solely because it results in a reduction of tax liability.

(e) A corporation=s share of a partnership=s gross receipts that is included in the corporation=s federal taxable income must be used in computing the corporation=s gross receipts under this section. Unless otherwise provided by this chapter, a corporation may not deduct costs incurred from the corporation=s share of a partnership=s gross receipts. The gross receipts must be apportioned as though the corporation directly earned them.

Tex. Tax Code Ann. ' 171.112 (a)-(c) (West 2002). The parties= dispute centers on the proper interpretation of subsection (b).

11

Anderson-Clayton urges that subsection (b)=s requirement that it use the same Aaccounting method@ to Aapportion@ taxable earned surplus as it uses in computing its federal taxable income means that it should disregard the trusts, as it does when computing federal taxable income, when Asourcing@ the trust=s investment earnings to either the numerator of the apportionment formula (Agross receipts from business done in this state,@ as determined under section 171.1032) or the denominator (Agross receipts from its entire business,@ as determined under section 171.1051). *Id.* '' 171.1032, .1051, .106(b), .110(a)(2). Thus, Anderson-Clayton reasons, it should treat the investment earnings as direct payments from the out-of-state investment vehicles to it, and, accordingly, not include those earnings in Agross receipts from business done in this state.@

The Comptroller=s position regarding subsection (b) has continued to evolve during this appeal.[6] The Comptroller presently argues that subsection (b) is not intended to address sourcing of receipts under Sections 171.106, 171.1032 and 171.1051, but only *when* gross receipts and related earned surplus income are recognized. The Comptroller asserts that there are several appropriate methods of accounting that a company could use to determine its reportable federal income. Some of these methods allow income and expenses to be deferred such as by use of installment, percentage-of-completion, or completed-contract accounting. The Comptroller urges that subsection (b) merely requires taxpayers to use

_____

[6] In her initial brief, the Comptroller concluded that subsection (b) did not direct the use of federal income tax rules to determine *where* the payor is but rather *what portion* of earned-surplus income may be taxed. During oral argument, however, the Comptroller shifted focus to urge this Court to read subsection (b) of section 171.1121 together with (c), which prohibits consolidated reporting, to manifest a broader intent to apportion income to each entity and not treat them as flow-throughs. Subsequently, the Comptroller conceded in a post-submission brief that A[c]onsolidated reporting is not at issue here.@

12

the same method of accounting they use to compute federal reportable taxable income to determine when to recognize earned surplus for franchise tax purposes. The question of where or from whom the investment earnings are deemed to emanate, the Comptroller maintains, is instead determined by Texas tax and trust law, which considers trusts to be separate entities.

**Section 171.1121(b)**

*Statutory construction principles*

When construing a Texas statute, our paramount task is to ascertain the Texas Legislature=s intent in enacting that provision. We first look to the plain and common meaning of the words the legislature used. Tex. Gov=t Code Ann. ' 311.011 (West 1998); *Kroger Co. v. Keng*, 23 S.W.3d 347, 349 (Tex. 2000); *Texas Workers= Comp. Comm=n v. Texas Builders Ins. Co.*, 994 S.W.2d 902, 908 (Tex. App.CAustin 1999, pet. denied). We are to presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect. *Cities of Austin, Dallas, Ft. Worth and Hereford v. Southwestern Bell Telephone Co.*, 92 S.W.3d 434, 442 (Tex. 2002); *see State v. Evangelical Lutheran Good Samaritan Soc=y*, 981 S.W.2d 509, 511 (Tex. App.CAustin 1998, no pet.). Unless a statute is ambiguous, we abide by the clear language of the statute and enforce it as written. *RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex. 1985).

Also, the legislature has prescribed that A[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.@ Tex. Gov=t Code Ann. ' 311.011(b) (West 1998) (Code Construction Act). The Code Construction Act also requires us to consider, among other things, statutory provisions on the same or similar subjects. *Id.* '

13

312.008 (West 1998). And, A[w]hen the same or a similar term is used in the same connection in different statutes, the term will be given the same meaning in one as in the other, unless there is something to indicate that a different meaning was intended.@ *Guthery v. Taylor*, 112 S.W.3d 715, 722 (Tex. App.CHouston [14th Dist.] 2003, no pet.).

Finally, while the term Aapportion@ in section 171.1121(b) is critical, we are not to view this term in isolation, but in context with the Texas franchise tax law as a whole. *Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.3d 864, 866 (Tex. 1999); *Thomas v. Cornyn*, 71 S.W.3d 473, 481 (Tex. App.CAustin 2002, no pet.). Additionally, the Code Construction Act authorizes us to consider the Aobject sought to be attained@ by the legislature when enacting the provision. Tex. Gov=t Code Ann. ' 311.023 (West 1998); *see also In re Bell*, 91 S.W.3d 784, 787 (Tex. 2002) (A[The Act] makes clear that courts may consider the Alegislative history@ and the Aobject sought to be attained@ in construing statutes.@).

### *Application*

Applying these principles of statutory construction convinces us that the legislature did not intend section 171.1121(b) to govern the sourcing of gross receipts to either Agross receipts from business done in this state@ or Agross receipts from its entire business@ in the earned surplus apportionment factor. Tex. Tax Code Ann. '' 171.1032, .1051, .106(b), .110(a)(2).

Although the parties have focused almost exclusively on the meaning of Aapportion@ in section 171.1121(b), that provision in fact contains two terms that are decisive in our analysis: corporations must Ause the same *accounting methods* to *apportion* taxable

14

earned surplus as used in computing reportable federal taxable income.@ We turn first to Aaccounting methods.@

Because both earned surplus, the tax base, and the Agross receipts@ used in apportioning it are derived from federal taxable income, the meaning of Aaccounting method@ in the Internal Revenue Code is especially instructive in our construction of section 171.1121(b). The Code Construction Act requires us to consider, among other things, statutory provisions on the same or similar subjects. Tex. Gov=t Code Ann. ' 312.008 (West 1998). In its AGeneral rule for methods of accounting@ in the Internal Revenue Code, Congress listed several Apermissible methods,@ including cash and accrual methods. 26 U.S.C.A. ' 446(c). Under cash accounting, income is recognized only upon the actual receipt of cash, property or services. By contrast, under accrual methods of accounting, income is recognized when all of the events occur that fix the right to receive income and determine its amount with reasonable accuracy. 26 U.S.C.A ' 446(c) (West 2002); 26 C.F.R. 1.446-1(c)(ii); Tax Management Portfolio, *Accounting MethodsCGeneral Principles*, No. 570 T.M. (2003), at A-24.[7] Numerous variants on accrual methods can be used, including the installment method (a method of assigning to particular tax years income from the sale of property for which payment

---

[7] Although the comptroller states in her brief that corporations like Anderson-Clayton cannot use cash accounting to compute federal reportable taxable income, the code=s reference to cash accounting is nonetheless illustrative of the nature of Aaccounting methods.@

is made over time)[8] and the percentage of completion method (a method of allocating costs and income from the performance of long-term contracts to particular taxable years).[9]

As these example illustrate, Aaccounting methods@ as contemplated in the franchise tax statute relate primarily to the timing of revenue and income recognition. The linchpin of Anderson-Clayton=s argumentCthat a grantor trust is treated as a flow-through for federal income tax recognition purposesCis instead a matter of substantive federal tax law governing whether tax liability is imposed on the trust or the grantor. Anderson-Clayton thus errs in extrapolating from this Aaccounting method@ a Texas sourcing methodology.

Nor does the term Aapportion@ as used in section 171.1121(b) suggest anything about sourcing. The legislature gave Aapportion@ a technical definition that we must apply in lieu of the more general meaning on which the dissent relies. *Ante* at ___; *see* Tex. Govt. Code ' 311.011(b). AApportion@ refers to the processes outlined in section 171.106. As detailed previously, section 171.106 provides that Ataxable earned surplus@ (as defined in section 171.110(a)) is Aapportioned@ to Texas by multiplying it by the fraction of Agross receipts from business done in this state@ (as determined under section 171.1032) divided by Agross receipts from its entire business@ (as determined under section 171.1051). *Id.* '' 171.1032, .1051, .106(b), .110(a)(2). None of these provisions speak to how receipts are

---

[8] 26 U.S.C.A. ' 453(c) (West 2002).

[9] *Id.* ' 460(b) (West 2002).

initially categorized as either Agross receipts from business done in this state@ or Agross receipts from . . . entire business.@ The legislature appears to have left that preliminary inquiry to other law.

As for what section 171.1121(b) might mean, we think it merely requires corporations to apply the same accounting method (e.g., the installment method, the percentage of completion method) when calculating both reportable federal taxable income and the Agross receipts@ it uses in the apportionment factor of section 171.106. The legislature=s evident intent in doing so stems from the fact that both Agross receipts@ used in the earned surplus apportionment factor and the taxable earned surplus that is being apportioned are derived from items reportable on the corporation=s federal income tax return. *Id.* '' 171.110(a), .1121(a). Taxable earned surplus is determined by:

> determining the corporation's *reportable federal taxable income*, subtracting from that amount any amount excludable under Subsection (k), any amount included in reportable federal taxable income under Section 78 or Sections 951-964, Internal Revenue Code, and dividends received from a subsidiary, associate, or affiliated corporation that does not transact a substantial portion of its business or regularly maintain a substantial portion of its assets in the United States, and adding to that amount any compensation of officers or directors, or if a bank, any compensation of directors and executive officers, to the extent excluded in determining federal taxable income to determine the corporation's taxable earned surplus;

*Id.* ' 171.110(a) (emphasis added). AGross receipts@ used in the earned surplus apportionment factor:

> means all *revenues reportable by a corporation on its federal tax return*, without deduction for the cost of property sold, materials used, labor performed, or other costs incurred, unless otherwise specifically provided in this chapter. "Gross receipts" does not include revenues that are not included in taxable earned surplus. For example, Schedule C special deductions and any amounts subtracted from reportable federal taxable income

under Section 171.110(a)(1) are not included in taxable earned surplus and therefore are not considered gross receipts.

*Id.* ' 171.1121(a) (emphasis added). As noted previously, a corporation may choose among several potential accounting methods when calculating its federal taxable revenues and income. If a corporation used inconsistent accounting methods to calculate Areportable federal taxable income@ (the foundation of taxable earned surplus) and the Arevenues reportable by a corporation on its federal income tax return@ (used in calculating Agross receipts@ for apportionment), it could conceivably recognize revenues and income for the current tax year in calculating one of these figures, yet recognize the same revenue and income in a different tax year when calculating the other figure. The result would be that the corporation would recognize revenues and income for taxable earned surplus purposes that is not also reflected in the apportionment factor, or vice versa. Either inconsistency would skew the apportionment process. If, for example, Texas receipts were reflected in taxable earned surplus for a particular tax year but not also in the corresponding apportionment factor, earned surplus would be disproportionately under-apportioned to Texas. Conversely, if Texas receipts are recognized in the apportionment factor but not in the taxable earned surplus being apportioned for that tax year, taxable earned surplus (not including those unrecognized receipts) would be disproportionately over-apportioned to Texas.

The dissent suggests that this reading of section 171.1121(b) renders that provision redundant and unnecessary, as section 171.1121(a) already defines Agross revenues@ used in the earned surplus apportionment factor as Aall revenues reportable by a corporation on its federal income tax return@

18

and Adoes not include revenues that are not included in taxable earned surplus.@ *Southwestern Bell Telephone*, 92 S.W.3d at 442 (Awe will presume that the Legislature used every word of a statute for a purpose@). We disagree that section 171.1121(a) forecloses the possibility that a corporation could use inconsistent accounting methods to calculate Arevenues reportable . . . on its federal tax return@ for use in apportionment under section 171.1121(a) and another to compute its Areportable federal taxable income@ in determining taxable earned surplus under section 171.110(a)(1). Because a corporation may choose among several accounting methods when calculating reportable revenues and income on its federal income tax return, the statutory references to Arevenues reportable . . . on its federal income tax return@ and Areportable federal taxable income@ do not alone preclude such inconsistent treatment.

We also find it instructive that, in 1995, the legislature added a provision parallel to section 171.1121(b) to the provisions governing assessment of franchise tax on the alternative tax base of taxable capital. Acts 1995, 74th Leg., R.S., ch. 1002, ' 13, *codified at* Tex. Tax. Code Ann ' 171.112(h). The methods for assessing the franchise tax on taxable capital are largely parallel to those regarding taxable earned surplus. Both taxable earned surplus and taxable capital are apportioned to Texas based on a factor of Agross receipts from business done in this state@ divided by Agross receipts from its entire business.@ *Id.* ' ' 171.106(a) & (b). The receipts to be included in each apportionment factor derive from virtually identical lists of business activities. *Compare id.* ' ' 171.103 & .105, *with id.* ' ' 171.1032 & .1051. However, gross receipts used in apportioning taxable capital are calculated differently than gross receipts used in apportioning taxable earned surplus. AGross receipts@ used in apportioning taxable capital

19

generally Ameans all revenues that would be recognized annually under a generally accepted accounting principles method of accounting,@ absent certain deductions. *Id.* ' 171.112(a) & (b).[10] This corresponds to the manner in which taxable capital, the corresponding tax base, is calculated:  under generally accepted accounting principles. *Id.* ' ' 171.101, 171.109(b); Tex. Bus. Corp. Act Ann. art. 1.02(27).   This linkage of the taxable capital tax base and its apportionment factor via generally accepted accounting principles is parallel to the linkage, through revenues and income reportable for federal income tax purposes, of taxable earned surplus and its apportionment factor.[11]

---

[10]   Where generally accepted accounting principles are unsettled or not sufficiently specific regarding a practice, the Comptroller is authorized to establish rules to govern the practice.  Tex. Tax Code Ann. ' 171.112(b) (West 1998). Also, corporations whose taxable capital is less than $1 million may report its gross receipts according to the method used on its most recent federal income tax return due before its franchise tax return is due. *Id.* ' 171.112(c).

[11]   As the Comptroller explained, in commentary just before the effective date of the 1991 amendments to the franchise tax statute authorizing the taxation of earned surplus, AThere must be a link between the element that is being apportioned (taxable capital, earned surplus) and the formula used to apportion it.  To do otherwise could lead to inequitable results.@ Tex. Comp. Pub. Acc=ts, Letter No. 9112L1265B01 (Dec. 4, 1991).

Prior to 1995, the provisions governing calculation of the taxable capital apportionment factor did not contain a provision similar to section 171.1121(b). Even before the amendment, both taxable capital and the gross revenues used in its apportionment factor were to be calculated based on generally accepted accounting principles. But merely specifying that a corporation must use *a* generally accepted accounting method to calculate each of these figures did not necessarily require the corporation to use the *same* method as to both, at least as the legislature viewed the statute. It added the requirement that Aa corporation shall use the same accounting methods to apportion its taxable capital as it used to compute its taxable capital.@ Acts 1995, 74th Leg., R.S., ch. 1002, ' 13, *codified at* Tex. Tax. Code Ann ' 171.112(h). The legislative history reveals that this amendment was intended to ensure the same A>parallel accounting treatment= required for earned surplus.@ S.B. 644, House Committee Report, Bill Analysis at 1-2.

Although we are not to rely on the enactments of a subsequent legislature as authoritative interpretations of a prior statute, *Cash America Intern Inc. v. Bennett*, 35 S.W.3d 12, 20 (Tex. 2000), we nonetheless find the 1995 amendments helpful in our interpretation of section 171.1121(b). At a minimum, they illustrate that the franchise tax statute would be at least unclear as to whether it would require Aparallel accounting treatment@Cthe use of the same accounting method to calculate both the tax base and its apportionment factorCabsent the language appearing in section 171.1121(b) and the 1995 amendment to the taxable capital provisions. Against that backdrop, we would not construe section

21

171.1121(b) as merely redundant of section 171.1121(a). *Southwestern Bell Telephone*, 92 S.W.3d at 442.

Because section 171.1121(b) is silent regarding the sourcing of receipts, we must look to other law to determine whether the income derived from the trusts should be considered a Texas receipt.

**Other law**

Before we turn to other law potentially governing the sourcing of the receipts at issue in this case, it is helpful to first consider the broader concepts underlying tax apportionment. Because the franchise tax is imposed on corporations for what is seen as a privilege bestowed upon them by doing business here, Athe formula employed to compute a corporation=s franchise tax is designed to achieve a tax commensurate with the value of the privilege granted@Ca formula that taxes only business done in this state. *See* Tex. Tax Code Ann. ' 171.001(a)(1); *Bullock,* 584 S.W.2d at 270. For many items, such as tangible items of commerce, what is considered to be business done in Texas is fairly clearCif the corporation received income from a sale of a product in Texas, it is a Texas receipt. However, for intangible sources of income, the sourcing of income as a Texas receipt was once unclear. For instance, would income from dividends earned through investments with a foreign corporation be considered a Texas receipt? The Comptroller answered the Aintangible sourcing@ question by adopting the Alocation of payor@ rule as its sourcing method. *See*

22

*Humble Oil*, 414 S.W.2d at 173.  Because the underlying justification of the franchise tax is predicated on taxing only benefits received by doing business in Texas, the Comptroller decided that the location of the payor of the intangible income would determine whether the income was derived from business in Texas and thus whether the income could be taxed.

Ultimately, we must determine whether the income derived from the trusts is properly considered Aother business done in this state@ in light of the Alocation of payor@ ruleCin other words whether the trust is the payor.  Tex. Tax Code Ann. ' 171.1032; *Humble Oil*, 414 S.W.2d at 173.  We are mindful that construction of a statute by an administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute.  *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993).  If the agency=s interpretation is consistent with the language and the purposes of the statute, the court will accept it, even if other reasonable interpretations exist.  *See Gene Hamon Ford, Inc. v. David McDavid Nissan, Inc.*, 997 S.W.2d 298, 305 (Tex. App.CAustin 1999, pet. denied).  In other words, because the Comptroller has determined that taxing income derived from trusts located in Texas is an appropriate interpretation of its power to tax Aother business done in this state,@ we will defer to the Comptroller=s conclusion if it is reasonable.  Tex. Tax Code Ann. ' 171.1032.

Under longstanding Texas law, trusts are considered separate entities, even where they may not be subject to federal income tax or the franchise tax.  *See* Tex. Prop. Code Ann. ch. 112 (West 1995 & Supp. 2004).  Because it is ultimately the trusts, separate and

23

distinct entities, that pay income to the funeral homes earned from their investments, we conclude that the comptroller≠s determination that the trusts are the payors is reasonable. Because it is undisputed that the trusts are domiciled in Texas, we determine that, according to the location of payor rule, the investment income derived from the trusts are Texas receipts. We also observe that sourcing the receipts to the Texas trusts is consistent with the broader policies underlying tax apportionment. By establishing a Texas trust to hold and invest revenues from its sale of prepaid funeral benefit plans, Anderson-Clayton availed itself of the benefits and protections of Texas law. It is not unreasonable for the Comptroller to attempt to apportion franchise taxes commensurate with these privileges and benefits. *Bullock,* 584 S.W.2d at 270.

## CONCLUSION

We hold that the district court did not err in granting summary judgment to the Comptroller and in denying Anderson-Clayton≠s summary judgment motion. We affirm the district court≠s summary judgment.


Bob Pemberton, Justice

Before Justices Kidd, Puryear and Pemberton: Opinion by Justice Pemberton;
    Dissenting Opinion by Justice Puryear

Affirmed

24

Filed:   August 12, 2004